Lina M. Mueller, Plaintiff-Appellant,

v.

McMillian Warner Insurance Company
and Merlin A. Switlick and Stephani Switlick,
Defendants-Respondents,†

Apollo Switlick and Security Health Plan
of Wisconsin, Inc., Defendants,

Metropolitan Property and Casualty Insurance
Company, Intervenor-Defendant.

Court of Appeals

*No. 2005AP121. Submitted on briefs June 20, 2005.
—Decided August 2, 2005.*

2005 WI App 210

(Also reported in 704 N.W.2d 613.)

† Petition to review granted 10-14-05.

154

157

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Carl L. Ricciardi* of *Carl L. Ricciardi Law Offices* of Tomahawk.

On behalf of the defendants-respondents, Merlin A. Switlick and Stephani Switlick, the cause was submitted on the brief of *Paul E. David* of *Wendorff, Ellison & David, LLP* of Wausau

On behalf of the defendant-respondent, McMillan Warner Insurance Company, the cause was submitted on the brief of *John A. Kramer* and *Michael J. Roman* of *Zalewski, Klinner & Kramer, LLP* of Wausau.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J.  Lina Mueller appeals a decision granting summary judgment to Merlin and Stephani Switlick in this personal injury case. Mueller also appeals a separate declaratory judgment that the Switlicks' homeowner's policy with McMillan Warner Insurance Company did not provide coverage for the all-terrain vehicle (ATV) Mueller was riding when her accident occurred.

¶ 2.  Mueller argues the trial court erred when it concluded she was not an injured third party for the purposes of Wis. Stat. § 125.035(4)(b), which establishes an exception to immunity from liability for those

who furnish alcohol to underage drinkers.[1] Mueller also argues the court erred when it determined that what the Switlicks did for her after her accident constituted "emergency care" under Wis. Stat. § 895.48(1), Wisconsin's Good Samaritan Law. Finally, Mueller argues that McMillan's policy provides coverage because the ATV involved in her accident was not "garaged" on the Switlicks' property.[2]

¶ 3. We conclude that material questions of fact remain as to whether Mueller was a party to the transaction in which Merlin and Stephani provided alcohol to their nineteen-year old son, Apollo. We also conclude that Merlin and Stephani did not render "emergency care" to Mueller and are thus not immune from liability under Wis. Stat. § 895.48(1). Finally, we conclude that the ATV involved in Mueller's accident was not "garaged" on the Switlicks' property. The judgments are therefore reversed and the cause remanded for further proceedings consistent with this opinion.

## BACKGROUND

¶ 4. In October 2003, Merlin and Stephani held a party for friends and business associates on property they owned in Lincoln County. The Switlicks used the property for a variety of recreational purposes, including hunting, and guests often spent the night at the family "shack," which had a number of bunkhouse style bedrooms.

¶ 5. According to Apollo's deposition testimony, he arrived at the party around 2 p.m. He drank what he described as a couple of twelve-ounce beers before 6

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] The ATV in question was owned by a family friend, Randy Van Loh.

p.m. and a few more beers between 6 p.m. and 10 p.m. Sometime between 6 p.m. and 7 p.m., Mueller arrived at the party, went inside the shack with Apollo to play pool, and possibly to drink.[3] The adult guests stayed outside the shack, near a pit where the Switlicks had built a bonfire.

¶ 6.  At about 10 p.m., Apollo and Mueller joined the adults outside by the fire. Apollo testified that, once outside, he heard an ATV "puttering like it was running out of gas or was having a problem." Because Apollo knew his sister and her children had taken one of the family ATVs to check a field for deer, he thought that they might be in trouble. He noticed Randy Van Loh's ATV parked near the fire.[4] He got on Van Loh's ATV and Mueller got on behind him. Neither wore a helmet. After checking on his sister, Apollo and Mueller headed back to the shack on a trail that was not on the family property.

¶ 7.  During that return trip, the accident that gave rise to this lawsuit occurred. According to Apollo, he hit a stump or saw an overhanging branch, slammed on his brakes, and then remembered nothing until he and Mueller got back to the shack around 11 p.m.[5] Both Apollo and Mueller were bleeding and vomiting.[6] Al-

---

[3] The record includes no account by Mueller of the events of that evening. Her injuries, which included a skull fracture, resulted in memory loss.

[4] The Switlicks owned two ATVs, but both were in use at the time. Apollo recognized Van Loh's ATV and knew its keys were ordinarily left in the starter.

[5] Apollo remembered nothing about the ride back to the shack and, based on his deposition testimony, was unclear about the sequence of events leading up to the accident.

[6] Mueller vomited immediately upon her return to the shack. It is unclear when Apollo began vomiting, but both he and Mueller vomited before and after they lay down for the evening.

though the details of what happened next are in dispute, the basic sequence of events is not. Apollo and Mueller talked to Stephani and Merlin. Mueller went into the bathroom and wanted to lie down on the floor. Stephani eventually convinced Mueller to lie down in one of the bedrooms instead. Apollo also lay down in the same bed. Stephani testified that she woke Apollo and Mueller approximately every hour during the evening. In the morning, after Mueller responded to Stephani's questions by addressing her as "mom," Stephani called an ambulance. Mueller was taken to a hospital in Merrill where she was diagnosed with a skull fracture. She was then transported to a facility in Marshfield where she was hospitalized and treated.

¶ 8. In January 2004, Mueller sued Apollo for negligence, an action that is still before the trial court. Five months later, she filed an amended complaint alleging that Merlin and Stephani were negligent in providing alcohol to minors and in providing care for her after the accident. The trial court agreed to bifurcate coverage issues. In response, McMillan filed motions for summary judgment on the merits of the claims against Merlin and Stephani and on the coverage issues. After a hearing, the trial court issued a written decision concluding that Merlin and Stephani had provided traditional first aid to Mueller and were thus immune from liability under WIS. STAT. § 895.48(1); it also determined that Mueller had no cause of action under WIS. STAT. § 125.035(4)(b) because she "was one of the principals to the consumption of alcohol by underage persons." In a separate written decision, the court found that the McMillan homeowner's policy did not provide liability coverage for Mueller's accident because Van Loh's ATV was "garaged" on the Switlicks' property. Mueller now appeals.

## DISCUSSION

¶ 9.   We review summary judgment decisions without deference, using the same methodology as the trial court. *See Anderson v. American Fam. Mut. Ins. Co.*, 2003 WI 148, ¶ 9, 267 Wis. 2d 121, 671 N.W.2d 651. Summary judgment should be granted when no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). The summary judgment questions in this case turn on the interpretation of two statutes creating immunity from civil liability. The proper interpretation of those statutes is also a question of law subject to de novo review. *Czapinski v. St. Francis Hosp.*, 2000 WI 80, ¶ 12, 236 Wis. 2d 316, 613 N.W.2d 120.

*Liability Exemption for Alcohol Providers
and Exceptions to the Exemption*

¶ 10.   Under Wisconsin law, individuals are ordinarily immune from liability for injuries that arise from "procuring . . . selling, dispensing or giv[ing] away" alcoholic beverages to adults.[7] Wisconsin Stat. § 125.035(4)(b) creates an exception to that general immunity for those who furnish alcohol to underage drinkers who are not "accompanied" by parents, guardians or spouses of legal age when that alcohol is a substantial factor in causing injury to a third party.[8] Those who serve or otherwise supply alcohol to under-

---

[7] *See* Wis. Stat. § 125.035(2).

[8] Liability exists if the "provider knew or should have known that the . . . person was under the legal drinking age and if the alcohol . . . provided to the underage person [is] a substantial factor in causing injury to a 3rd party." Wis. Stat.

age drinkers thus retain their immunity from liability if the underage drinker is "accompanied" by his or her parents. Liability is further limited by our supreme court's conclusion that principals to transactions that violate WIS. STAT. § 125.07(1)(a) are not third parties under § 125.035(4)(b). *Meier v. Champ's Sport Bar & Grill, Inc.*, 2001 WI 20, ¶ 17, 241 Wis. 2d 605, 623 N.W.2d 94.

¶ 11.   Mueller argues that Merlin and Stephani are not protected "providers" because they were not "accompanying" Apollo when he drank the alcohol they procured for him. She also argues that the trial court erred when it concluded the Switlicks were immune from liability for any consequences arising from Apollo's consumption of alcohol because there are material questions of fact as to whether she was a party to any transaction with Merlin and Stephani. We will address Mueller's arguments in order.

¶ 12.   The parties agree that Merlin and Stephani were not "providers" of alcohol if Apollo was "accompanied" by his parents when the alcohol in question was provided to him. The trial court concluded that "accompanied" entailed a degree of individualized supervision absent in this case. Merlin and Stephani contend it does not matter whether they were in the same room with Apollo when he was drinking. It was enough that he drank "in their proximity" and on the same premises,

§ 125.035(4)(b). But that liability is only triggered if the provider violates WIS. STAT. § 125.07(1)(a) which states that "no person may procure for, sell, dispense, or give away any alcohol[ic] beverages to any underage person not accompanied by his or her parent, guardian or spouse who has attained the legal drinking age."

163

with their knowledge. McMillan agrees, arguing the trial court mistakenly imported the idea of individualized supervision from an opinion construing the word "accompanied" in a Milwaukee curfew ordinance. *See City of Milwaukee v. K.F.*, 145 Wis. 2d 24, 37–38, 426 N.W.2d 329 (1988).

¶ 13. Although we agree that *City of Milwaukee* does not control the meaning of "accompanied" in Wis. Stat. § 125.07(1)(a), the supreme court's analysis of the curfew ordinance is instructive nevertheless. The ordinance prohibited children under the age of seventeen from being in public places after 11 p.m. unless "accompanied by his or her parents . . . or other adult person having his or her care, custody or control." Milwaukee, Wis., Code of Ordinances § 106–23. *City of Milwaukee*, 145 Wis. 2d at 31. The supreme court observed that parents could have care, custody and control over children they brought to a dance without necessarily "accompanying" those children. *Id.* at 38. "Accompanying," the court concluded, required a degree of "individualized supervision" that mere presence might not satisfy. *Id.*

¶ 14. Mueller points to other statutes that allow children or juveniles to engage in otherwise prohibited activities when accompanied by adults. Children under twelve are allowed to operate snowmobiles, for example, if they are accompanied by an adult; in that statute, accompanied is defined as being on the same snowmobile. Wis. Stat. § 350.05(1) and (4). Similarly, children under twelve may operate ATVs if they are accompanied —defined as "subject to continuous verbal direction and control"—by an adult. Wis. Stat. § 23.33(1)(a) and (5)(a). Finally, children between twelve and fourteen years old are not allowed to hunt unless they are accompanied by an adult. Wis. Stat. § 29.304(2)(a). McMillan argues that the Milwaukee ordinance and these statutes are distin-

guishable in two ways from the statute we interpret here. First, they apply to younger children, not to older teens or adults. Second, accompany is defined in the other statutes, but not in WIS. STAT. § 125.07(1)(a).[9] We are not persuaded.

¶ 15.   The Milwaukee ordinance and the statutes Mueller cites share a basic presumption and serve similar public policies. Certain instrumentalities, such as hunting rifles, are dangerous enough that the people of Wisconsin ordinarily restrict their use or enjoyment to those with a certain level of maturity. But the legislature has determined that the risks associated with immature users can, in certain cases, be limited if those users are under adult control. Similarly, the legislature has decided that those under twenty-one cannot buy or consume alcohol legally because it is a dangerous instrumentality that most people under twenty-one are too immature to handle. To support that prohibition, the legislature has made those who provide underage drinkers with alcohol liable for third party injuries arising out of the prohibited transaction. The legislature has also determined, however, that providers are exempt from liability if the underage drinker is accompanied by a parent because that parent is presumed to be supervising the child's consumption of alcohol, minimizing the risks associated with underage drinking.

¶ 16.   We therefore conclude that underage drinkers are not accompanied by a parent merely because the parent and child are on the same premises. Merlin testified that he had told Apollo not to drink where he could be observed by the other guests and both Merlin

---

[9] The statute regulating youthful hunters does not, contrary to both Mueller's and McMillan's arguments, define accompany.

and Stephani admitted they did not know how much their son drank between 2 p.m. and 10 p.m. Based on those undisputed facts, Merlin and Stephani were neither supervising nor otherwise controlling Apollo when he was drinking and were thus not accompanying him for the purposes of Wis. Stat. § 125.07(1)(a).

¶ 17. Mueller also argues the trial court erred when it granted summary judgment to Merlin and Stephani on the grounds that Mueller was not an injured third party under Wis. Stat. § 125.035(4)(b). We agree.

¶ 18. In a case involving underage drinkers in a bar, our supreme court concluded that "the transactional focus of [Wis. Stat.] § 125.035(4)(b) is the provision of alcohol to underage persons. The principal parties to such a transaction are: (1) providers and (2) underage drinkers." *Meier*, 241 Wis. 2d 605, ¶ 24. Based on the ordinary meaning of the term third party—one who is not a principal—the court reasoned that a provider could not also be a third party because he or she was a principal in the transaction at issue.

¶ 19. Although *Meier* dealt with an underage drinker who was also a provider, McMillan claims its holding controls this case. According to McMillan, Mueller's allegation that the Switlicks provided alcohol to her is sufficient to make her a principal to the transaction under *Meier*. Merlin and Stephani similarly contend that Mueller was a principal to the transaction because they claim that it is undisputed that she consumed alcohol with Apollo at the shack. Both arguments sidestep the real issue.

¶ 20. Several years after *Meier*, the supreme court returned to the third party issue in a different context. In *Anderson*, a mother bought her nineteen-year-old

166

son a bottle of vodka and left it on the kitchen table with a note telling him that he owed her twelve dollars. *Anderson*, 267 Wis. 2d 121, ¶¶ 3, 6. Her son later took the vodka to the family's vacation home where he and underage friends drank it. *Id.*, ¶ 6. One of the friends died of acute alcohol intoxication. *Id.* In considering whether the mother was immune from liability, the court made it clear that *Meier* did not stand for the proposition that underage consumers of alcohol were not automatically third parties. *Anderson*, 267 Wis. 2d 121, ¶¶ 29–30.

¶ 21. The court reiterated that only the principals to a transaction, the provider and the underage drinker, could not be third parties. But they found no evidence that the son's companions were present when the mother bought the alcohol, or that they paid for it, or that they requested she buy it. *Id.*, ¶ 19. Under those circumstances, the son's friends were not principals in the transaction between son and mother. *Id. Anderson* concluded that "an underage drinker who is injured or dies as a result of the consumption of alcohol that was illegally provided to a companion underage drinker is an injured third party for the purposes of the exception to immunity." *Id*, ¶ 36.

¶ 22. Here, as in *Anderson*, there is no evidence Mueller asked Merlin or Stephani to procure alcohol for her and no evidence she paid them for it. *See id.*, ¶ 19. Apollo testified that Mueller drank several beers, but said nothing about where she got them. Neither Merlin nor Stephani saw Mueller drink and there is no evidence about how, if she did drink, she obtained alcohol. We thus conclude that summary judgment was improper because there is a material question of fact as to whether Mueller was a principal to the transaction between Apollo and his parents or whether she was an underage drinker injured as a result of alcohol illegally provided to a companion underage drinker.

167

¶ 23.   The trial court concluded that Merlin and Stephani were immune from liability under Wɪs. Sᴛᴀᴛ. § 895.48(1) for anything they might have done, or not done, between the time Mueller returned to the shack and when she was taken to the hospital. According to that section of the Good Samaritan Law:

> Any person who renders emergency care at the scene of any emergency or accident in good faith shall be immune from civil liability for his or her acts or omissions in rendering such emergency care . . . .

Mueller contends critical portions of the law are ambiguous because "scene of any emergency or accident," "emergency care," and "good faith" are each susceptible of more than one meaning.[10] She further contends the court erred when it determined there was no material question of fact as to whether the Switlicks' shack remained "the scene of an emergency or accident," whether the Switlicks' responses to Mueller's injuries constituted "emergency care," and whether they acted in "good faith." We agree the Switlicks are not immune from liability under Wisconsin's Good Samaritan Law.[11]

---

[10] On appeal, Mueller claims the trial court "did not find that the statute was ambiguous." She is correct that the court's written decision never makes that finding explicit; however, its extended discussion of the statute's history indicates that it did so implicitly.

[11] The attorney general has previously characterized certain portions of the statute as "plainly ambiguous" because they are neither "self-defining nor defined in the statute." 67 Oᴘ. Aᴛᴛ'ʏ Gᴇɴ. 218 (1978).

¶ 24.   When we interpret a statute, our goal is to ascertain and give effect to the statute's intended purpose. *See, e.g., Wenke v. Gehl Co.*, 2004 WI 103, ¶ 32, 274 Wis. 2d 220, 682 N.W.2d 405. To achieve those goals, we begin with the language of the statute. *State ex rel. Kalal v. Circuit Court*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. If the meaning of the statute is clear when we give its words their commonly accepted meanings, we ordinarily stop the inquiry. *Id.* A statute is ambiguous, according to the most common formulation of the test, if it is capable of being understood by reasonably well-informed persons in two or more senses. *Id.*, ¶ 47.

¶ 25.   Scene is commonly defined as "the place of occurrence or action" or "locale." WEBSTER'S THIRD NEW INT'L DICTIONARY 2028 (unabr. 1991). Emergency means both "an unforeseen combination of circumstances or the resulting state that calls for immediate action" and "a sudden bodily alteration such as is likely to require immediate medical attention." *Id.* at 741. Accident has an even broader meaning:  "chance . . . sudden event or change occurring without intent or volition . . . an unexpected medical development esp. of an unfavorable or injurious nature."[12] *Id.* at 11. Care is another general term whose definitions range from "suffering of mind"

---

[12] Read together, the definitions of "scene," "emergency," and "accident" suggest a focus on the victim's state or condition rather than on the character of the action that produced that state or the particular place in which that state first manifested itself. Such a reading is consistent with the broad purpose of Good Samaritan Laws:  to encourage all of us to respond to human beings who need immediate medical help when and where we encounter them. A child injured in a snowmobile accident may be in no less need of emergency care if he or she

to "serious attention" to "custody ... charge, supervision, management." *Id.* at 338–39. Based on these definitions, reasonably well-informed persons could clearly understand "scene of an emergency or accident" and "emergency care" in a variety of ways.

¶ 26. The term good faith only complicates the matter. Good faith can mean a "belief in one's legal title or right." *Id.* at 978. But it can also mean "absence of fraud, deceit, collusion, or gross negligence." *Id.* In other words, good faith can be measured subjectively or objectively. In the context of WIS. STAT. § 895.48(1), this ambiguous phrase would appear to control the determinations involved in identifying both the scene of an emergency or accident and rendering emergency care, amplifying the ambiguity of each.

¶ 27. No Wisconsin appellate court has construed the contested terms. However, the history of our Good Samaritan Law provides insight into the meaning of the statutory language. In 1963, the legislature granted immunity from civil liability to a limited group of professional individuals, primarily doctors and nurses, who in good faith "render[ed] emergency care at the scene of an emergency." WIS. STAT. § 149.06(5) (1963). The statute further defined scene of an emergency as areas "not within the confines of a hospital or other institution which has hospital facilities, or a physician's office." *Id.* The legislative intent was transparent: to encourage those with medical training to respond to emergency situations outside of the professional environment.[13] The statute presumably does not define

stumbles a half mile before he or she is found than if he or she is found right beside the snowmobile.

[13] *See* David A. Suemnick, *Wisconsin's "Good Samaritan" Statute,* 48 MARQ. L. REV. 80, 85–89 (1964–65).

emergency care because it was directed at those who were trained to understand what that term meant in a variety of contexts.

¶ 28. In 1977, the legislature expanded immunity to include any person who rendered emergency care in good faith at the scene of an emergency or accident.[14] *See* WIS. STAT. § 895.48 (1977). No definitions were added and the scene of emergency definition was removed.[15]

■

¶ 29. As this history indicates, Wisconsin's current Good Samaritan Law encourages all citizens to respond to emergency situations by protecting them from liability for most acts or omissions in rendering care that have bad consequences. While the statute does not define the scene of the emergency or accident or emergency care, the ordinary meanings of those terms and the policies the statute serves demonstrate that when the samaritan is a layperson, the intervention

---

[14] WISCONSIN STAT. § 895.48 was created by 1977 Wis. Laws, ch. 164, § 3, establishing a general Good Samaritan Law.

[15] The 1977 statute does retain a distinction between ordinary individuals and trained professionals:

> [t]his immunity does not extend when employees trained in health care ... render emergency care for compensation and within the scope of their usual and customary employment or practice at a hospital or other institution equipped with hospital facilities, at the scene of any emergency or accident, enroute to a hospital ....

Early drafts of the statute included a professional competence standard (in good faith and within the range of a person's professional competence) and a more general formulation of a standard of care ("shall not be construed as absolving from civil liability any person whose emergency care acts or omissions amount to a high degree of negligence"). Dawn B. Lieb, *The Good Samaritan Statute: WIS. STAT. § 859.48,* 62 MARQ. L. REV. 469, 474–75 (1978).

protected will ordinarily be of short duration and of an interim sort. Nothing in the statute suggests any intention that an ordinary person should make care-giving decisions any longer than the emergency situation necessitates.

¶ 30. Mueller argues that the Switlicks provided neither emergency care nor traditional first aid, which the trial court concluded satisfied the statutory requirement. She also argues alternatively that even if the first fifteen or twenty minutes after her return to the cabin constituted a period of emergency, the six or more hours after that while she slept and Stephani periodically checked on her cannot qualify as emergency care.

¶ 31. The Switlicks counter that it is the circumstances and not the type of care that matters. Emergency care is, they explain, "the type of care that may be provided at the scene of an emergency—regardless of what particular type of care might be provided." McMillan argues somewhat more specifically that Stephani provided attentive assistance, one definition of care, by comforting Mueller, observing her, and being vigilant for any change in symptoms that would "indicate something more serious than a bloody nose and nausea." We are not persuaded by either argument.

¶ 32. By her own account, Stephani went with Mueller, who was vomiting and bloody, into a bathroom where there was light. The two were going to start cleaning Mueller up when Mueller tried to lie down on the bathroom floor. Stephani's testimony was initially unclear on whether any cleaning was actually done. However, she eventually replied "yes" when asked "And you never got a chance to clean the blood off?" Stephani testified she then said, "Lina, instead of just laying there . . . . Why don't we take you and go lay you down in the bed." Once Mueller was in bed, Stephani covered

her with a quilt. Stephani also testified that she brought one aspirin into the bedroom for Mueller, but did not know whether she took it, and that she took water into the room, but did not believe Mueller wanted any.

¶ 33. At some point, Stephani left Mueller and Apollo, who was lying on the same bed, and went into the living room. She went back into the room to check on the two "about every hour." She testified that when she came in Mueller would wake up and she would ask Mueller if she knew where she was or how she was feeling. The room was dark. At 6 a.m., Stephani asked Mueller if she knew where she was. Mueller replied, "Mom?" When Stephani asked Mueller another question, she did not respond. Stephani woke up another woman who was staying at the shack and asked her to look at Mueller. Stephani then called 911.

¶ 34. Suggesting that a bloody and vomiting woman lie in a bed rather than on a floor, covering her with a quilt, leaving her alone in a dark room for six or more hours, and periodically asking if she felt all right does not, we conclude, constitute emergency care. Other jurisdictions have found that relatively simple acts, such as providing transportation to an emergency room or asking whether accident victims need help, can constitute emergency care for the purposes of Good Samaritan statutes.[16] But even if we disregard differences among Good Samaritan Laws, such persuasive

---

[16] In *Swenson v. Waseca Mut. Ins. Co.*, 653 N.W.2d 796, 799–800 (Minn. App. 2002), the court found that transporting an injured child fell within the scope of the Good Samaritan Law even though the driver did not go directly from the scene of the accident to the hospital, but took a quarter-mile detour. The North Dakota Supreme Court concluded that a passerby who stopped at the scene of an accident to see if victims needed

precedent is factually distinguishable. In those cases, individuals provided care either by transporting injured persons to a place where their injuries could be treated or by attempting to make medical help available.

¶ 35. Here, by contrast, Stephani did nothing for Mueller she could not have done for herself, except waking her up during the night. Without cleaning Mueller's wounds, Stephani had no way of knowing what her injuries were. Questioning Mueller in the dark made it impossible for Stephani to observe any physical changes. And waking Mueller every hour or so does not indicate that Stephani treated her as someone whose state calls for "immediate action." That nothing was done to make medical help available to Mueller for over six hours only underscores the fact that Stephani was not responding as if to an emergency. Based on the undisputed facts in this case, the Switlicks thus did not provide any care that would entitle them to immunity from liability under WIS. STAT. § 895.48.

*The Meaning of Garaging in a Homeowner's Policy*

¶ 36. Finally, Mueller argues the trial court erred when it concluded the Switlicks' homeowner's policy with McMillan did not provide coverage for their son's use of a neighbor's ATV. Again we agree.

¶ 37. Like the interpretation of statutes, the interpretation of an insurance policy is a question of law this court reviews without deference, applying the same rules of construction we apply to contracts generally.

---

assistance was "rendering" emergency care because the person was attempting to make aid available. *McDowell v. Gillie*, 2001 ND 91, 626 N.W.2d 666, ¶ 12.

*See Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶¶ 22–23, 233 Wis. 2d 314, 607 N.W.2d 276. We interpret insurance policies as a reasonable person in the position of the insured would understand them. *Kremers-Urban Co. v. American Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984).

¶ 38. Under 1c of the Exclusions section of the Switlicks' homeowner's policy, McMillan will not pay for "bodily injury" or "property damage" arising out of "the ownership . . . entrustment or use of . . . any 'recreational vehicle,' " if that injury or damage occurs away from the "insured premises." No one disputes that the accident in this case occurred away from the insured premises. The parties similarly agree that, for the purposes of the policy, an ATV is a recreational vehicle. This exclusion would thus deny coverage for Mueller's accident unless an exception pertaining to that exclusion reinstates it. *See American Fam. Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65.

¶ 39. Exclusion 1c includes two exceptions. The first deals with motorized golf carts; the second states: " 'we' will cover: ... use of a 'recreational vehicle' which is not owned, garaged, or maintained by any 'insured person' on or off of the 'insured premises.' " The question before us is whether the exception to the exclusion for use of a recreational vehicle "which is not owned, garaged, or maintained by an insured person on or off the insured premises" applies to the facts in this case. More specifically, we must decide whether a recreational vehicle is garaged if it is left on a property for some period ranging from two and one half weeks to a single day.

¶ 40. Van Loh testified that he left his ATV at the Switlicks' shack some two or two and a half weeks before the accident, although he had never left it there for more than a day or two in previous years. He also testified that he left the ATV in the detached garage near the shack, but later said that when he went to visit the Switlicks on October 25, 2003, the day of the accident, it might have been pushed outside. Apollo testified that he thought Van Loh brought his ATV over on the day of the accident. Stephani could not remember when the ATV appeared, but knew it had not been there during the July 4th holiday. Merlin testified that, at the time of the accident, all the ATVs were outside because his garage was full of lumber, a little Ford tractor, several freezers, and various barrels. The garage had been that full for around three weeks. He did not know how long Van Loh's ATV had been there. All agreed that Van Loh never paid the Switlicks for parking the ATV on their property and that there was no formal agreement or arrangement for his use.

¶ 41. No Wisconsin court has interpreted the term garaged when it appears in a homeowner's policy. Statutory requirements for uninsured motorist coverage typically refer to motor vehicles "registered or principally garaged in this state." *See, e.g.,* Wis. Stat. § 632.32(4). In a case that turned principally on other issues, our supreme court commented that: "it could not be said that the Buick was principally garaged in Milwaukee; it had only been in Milwaukee approximately two to three weeks." *Handal v. American Farmers Mut. Cas. Co.*, 79 Wis. 2d 67, 77, 255 N.W.2d 903 (1977). Though *Handal* does not define the term garaged, it implies that garaging entails a degree of permanence associated with time. Other jurisdictions have made that link more explicit. "We construe the

term 'principally garaged' to mean the physical location where an automobile is primarily or chiefly kept." *Chalef v. Ryerson*, 648 A.2d 1139, 1141 (N.J. Super. 1994).

¶ 42.  In everyday language, the word garage has several meanings when used alone:  to keep or protect, a building used for housing an automobile, and a repair shop for automobile vehicles. That does not mean, however, that garage is necessarily ambiguous. All words have multiple meanings or shades of meaning, but context and other cues usually operate to save us from perpetual confusion. No reasonable person in the Switlicks' position would understand that this exclusion in a homeowner's policy would apply only to those who had a repair shop on their premises. Nor, despite McMillan's argument, would a reasonable person believe that one garages a car anytime one parks it any place. To the extent that a homeowner's policy is expected to provide coverage for an insured home, it would thus be reasonable to expect this exception to apply when that home is the permanent or regular place where the recreational vehicle is kept.

¶ 43.  In this case, there is no evidence that Van Loh regularly left his ATV at the Switlicks' shack for extended periods. Nor is there any evidence that, on the single occasion in question, he left the ATV there for more than two-and-a-half weeks. We do not determine exactly how long it would take to turn parking into garaging, but we conclude that casual, one-time use of a property that spans less than three weeks is not sufficient to accomplish that transformation. Because Van Loh's ATV was not garaged on the Switlicks' property, the Switlicks' homeowner's policy with McMillan provides coverage for Mueller's accident.

177

*By the Court.*—Judgments reversed and cause remanded.

¶ 44. HOOVER, P.J. (*concurring*). I concur with the result. I write separately and briefly, however, to take issue with the majority's treatment of the immunity issue under WIS. STAT. § 895.48(1), the Good Samaritan Law. First, I am not entirely convinced that Stephani Switlick's activities did not constitute providing "emergency care" to Mueller. On the one hand, it could be plausibly argued that Stephani was not providing care in the sense that she was not addressing the root cause of Mueller's symptoms. Rather, Stephani was arguably effectively preventing or delaying provision of care for an apparent traumatic head injury that caused nausea. On the other hand, while Mueller presented with a bloody nose and nausea, she was nevertheless able to ambulate and converse cogently with Stephani, until 6 a.m. Then, for the first time, Mueller responded inappropriately to the questions Stephani asked for the purpose of monitoring Mueller's cognitive functioning. I am not fully persuaded that when dealing with a person the nature of whose injuries are such that the severity is not manifest, monitoring someone's cognitive functioning on an hourly basis does *not* qualify as emergency care. However, I need not resolve this issue, because I would hold that even if Stephani provided emergency care to Mueller, she did not do so at "the scene of any emergency or accident." *See* WIS. STAT. § 895.48(1).

¶ 45. The trial court held, and the majority evidently agrees, that an emergency travels with the injured party, on the theory that once removed from the scene, the injured person still requires care. Unfortunately, neither of the respondents' briefs provide any

178

further analysis on this point. In particular, they provide no discussion on how this concept of "the scene of any emergency" pertains to the entire time after Mueller was injured until she was placed in the ambulance some eight hours later.

¶ 46. The language utilized by the legislature suggests to me that the scene of an emergency, similar to the scene of an accident, refers to the location where the event giving rise to the need for emergency care occurred. The statute serves to encourage strangers who happen upon the scene of an emergency to stop and render aid, rather than avert their conscience, if not their eyes, and pass by to avoid potential liability. To extend the "scene" through to wherever the injured person ends up appears to me to broaden the immunity beyond the statute's language. Such an approach could include everyone "down the line" who renders care associated with an emergency, regardless of their relationship to where the event giving rise to the need for care occurred, or their relationship to the immediacy of the care necessitated by the event.

¶ 47. Based upon my alternative view, I would hold that any care Stephani provided to Mueller was not provided at *the* scene of an emergency. I therefore concur with the majority that immunity does not apply under WIS. STAT. § 895.48(1).[1]

---

[1] I note that Mueller does not argue that if Stephani is immune under WIS. STAT. § 895.48(1), such immunity does not apply to Merlin or that the latter did or did not do anything regarding treatment to cause him to be separately liable in that regard.