Lina M. MUELLER, Plaintiff-Appellant,

v.

MCMILLIAN WARNER INSURANCE COMPANY,
Defendant-Respondent,

Merlin A. SWITLICK and Stephani Switlick,
Defendants-Respondents-Petitioners,

Apollo SWITLICK and Security Health Plan
of Wisconsin, Inc., Defendants,

METROPOLITAN PROPERTY AND CASUALTY INSURANCE
COMPANY, Intervenor-Defendant.

Supreme Court

*No. 2005AP121. Oral argument March 2, 2006.
—Decided May 25, 2006.*

2006 WI 54

(Also reported in 714 N.W.2d 183.)

572

For the defendants-respondents-petitioners, there were briefs by *Paul E. David* and *Wendorff, Ellison & David, LLP,* Wausau, and oral argument by *Paul E. David.*

For the plaintiff-appellant, there was a brief by *Russell T. Golla* and *Anderson, O'Brien, Bertz, Skrenes & Golla,* Stevens Point; *Carl L. Ricciardi* and *Law Offices of Carl Ricciardi,* Appleton, and oral argument by *Russell T. Golla.*

An amicus curiae brief was filed by *William C. Gleisner, III* and *Law Offices of William Gleisner,* Milwaukee; *Robert L. Jaskulski* and *Habush Habush & Rottier, S.C.,* Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of that part of a published decision of the court of appeals reversing the judgment of the circuit court for Marathon County, Vincent K. Howard, Judge, granting summary judgment to defendants Merlin and Stephani Switlick.[1] The circuit court dismissed plaintiff Lina Mueller's claims for damages against the Switlicks for their alleged negligence in caring for her. We affirm the decision of the court of appeals reversing the judgment of the circuit court in favor of the Switlicks.

¶ 2. The dispositive issue is whether the actions taken by the Switlicks between the time they initially evaluated and immediately assisted and treated Lina Mueller and intervened on her behalf and the time they called 911 six to seven hours thereafter constitute emergency care at the scene of any emergency or accident in good faith for the purpose of Wis. Stat. § 895.48(1) (2003–04),[2] the Good Samaritan immunity statute.

¶ 3. This case involves the interpretation and application of Wis. Stat. § 895.48(1), which establishes "Good Samaritan"[3] immunity from tort claims, to the undisputed facts in the instant case. Section 895.48(1) states in relevant part:

> Any person who renders emergency care at the scene of any emergency or accident in good faith shall be immune from civil liability for his or her acts or omissions in rendering such emergency care.

---

[1] *Mueller v. McMillian Warner Ins.*, 2005 WI App 210, 287 Wis. 2d 154, 704 N.W.2d 613.

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

[3] The term "Good Samaritan" derives from the New Testament parable in which a Samaritan was the only passer-by to aid a man left half-dead by thieves. *See* Luke 10:25–37.

¶ 4. The Switlicks argue that they are immune from liability under the Good Samaritan statute for their acts or omissions in rendering care to the plaintiff. In particular, the Switlicks argue that all their acts or omissions regarding the plaintiff occurred at the scene of the emergency and constitute emergency care rendered in good faith.

¶ 5. The plaintiff argues that the care rendered by the Switlicks was not at the scene of any emergency or accident. She further argues that the Switlicks did not provide emergency care or that the care they rendered ceased to be emergency care after their initial evaluation and immediate assistance, treatment, and intervention ended.

¶ 6. We hold that whatever the precise scope of "scene of any emergency or accident" in Wis. Stat. § 895.48(1), the phrase "scene of any emergency" is sufficiently broad to include the Switlicks' home where the injured, bleeding plaintiff arrived after being hurt in an incident involving an all-terrain vehicle (ATV) in the woods. We further hold that, in the circumstances of the present case, "emergency care" under § 895.48(1) refers to the initial evaluation and immediate assistance, treatment, and intervention rendered to the plaintiff during the period before care could be transferred to professional medical personnel.

¶ 7. While the Switlicks' initial evaluation and immediate assistance, treatment, and intervention on behalf of the plaintiff may have constituted emergency care under the statute,[4] the care the Switlicks rendered after this initial evaluation and immediate assistance,

---

[4] We need not, and do not, determine whether the Switlicks are immune for any emergency care they may have provided; we

treatment, and intervention and before Ms. Switlick called 911 six to seven hours later was not "emergency care." Professional medical assistance could have been summoned. When the Switlicks decided not to seek professional medical assistance after initially assessing the plaintiff's injuries and placed her in bed for continued observation, emergency care ceased and non-emergency care began.[5] Because a caregiver is not immunized by the Good Samaritan statute for non-emergency care, the caregiver is subject to the common-law rules governing the conduct. It does not necessarily follow that the caregiver will be liable for damages under common-law negligence rules. We agree with the court of appeals that the Switlicks are not entitled to Good Samaritan immunity for their non-emergency care.

¶ 8. Accordingly we affirm the decision of the court of appeals and remand the matter to the circuit court for further proceedings on the plaintiff's negligence claims against the Switlicks.

I

¶ 9. The following facts are undisputed for the purposes of the circuit court's summary judgment in favor of the Switlicks on their Good Samaritan defense.

¶ 10. Merlin and Stephani Switlick are the parents of Apollo Switlick, who was 19 years old at the time of the plaintiff's injury. On the day the plaintiff was injured, the Switlicks were hosting a party on property they owned in Lincoln County. The Switlicks regularly

have not examined whether the third element of the Good Samaritan statute, good faith, has been met.

[5] Whether this non-emergency care was negligent is not before the court.

host guests at their Lincoln County property, and guests often spend the night in the family "shack," which has a number of "bunkhouse-style" bedrooms. Apollo arrived at the party around 2:00 p.m. He drank what he described as a couple of twelve-ounce beers before 6:00 p.m. and a few more beers between 6:00 p.m. and 10:00 p.m.[6]

¶ 11. The plaintiff, Apollo's girlfriend of two years, arrived at the party sometime between 6:00 p.m. and 7:00 p.m. Apollo and the plaintiff went inside to play pool. The plaintiff may have consumed alcohol while inside.[7]

¶ 12. At around 10:00 p.m. Apollo and the plaintiff joined the Switlicks and their guests outside at a bonfire. Apollo testified that once outside he heard the sound of a malfunctioning ATV and decided to go check on his sister and her children, who had taken a family ATV to look for deer. Apollo got on an ATV belonging to one of the guests. The plaintiff got on behind him. Neither wore a helmet. After checking on his sister, Apollo and the plaintiff headed back to the shack on a trail that was not on the family property.

¶ 13. On the return trip the incident that produced the plaintiff's injuries occurred. According to Apollo, the ATV hit a stump; he then saw an overhanging branch and slammed on the brakes. Apollo remembered nothing else about the incident.[8] Apollo and the plaintiff returned to the shack around 11 p.m. Both

---

[6] Whether the Switlicks are liable to the plaintiff for providing Apollo with alcohol is not currently before the court.

[7] The plaintiff's memory loss prevented her from recalling the events of the evening, including whether she consumed any alcohol.

[8] Apparently due in part to his injuries, Apollo's recollection of the events leading up to the plaintiff's injury is incomplete.

were bleeding and both vomited shortly after arriving. Mr. Switlick observed that the plaintiff was agitated, and he touched her teeth to determine if any were loose.

¶ 14. The plaintiff then went inside the bathroom and wanted to lie down on the bathroom floor. Ms. Switlick persuaded the plaintiff to lie down in one of the bedrooms. Ms. Switlick testified she awoke the plaintiff approximately every hour to check on her. Throughout the night, the plaintiff was able to respond coherently to Ms. Switlick's questions.

¶ 15. In the morning, after she had been in bed for approximately six to seven hours, the plaintiff was disoriented and responded to Ms. Switlick's questions by addressing Ms. Switlick as "mom." As a result of the plaintiff's confusion, Ms. Switlick called for an ambulance. The plaintiff suffered serious, continuing injuries.

¶ 16. The plaintiff sued the Switlicks, alleging they were negligent in providing alcohol to their minor son, in failing to convey her to a hospital, in preventing her from obtaining medical treatment, and in failing to seek help for her.

¶ 17. The circuit court entered a judgment dismissing the plaintiff's complaint, ruling that under Wis. Stat. § 895.48(1) the Switlicks were immune from liability for any of their acts or omissions occurring between the time when the plaintiff returned to the shack and when care of the plaintiff was transferred to emergency medical personnel.

¶ 18. The court of appeals reversed the circuit court's judgment. The court of appeals concluded:

> [W]hen the [S]amaritan is a layperson, the intervention protected will ordinarily be of short duration and of an interim sort. Nothing in the statute suggests any

580

intention that an ordinary person should make care-giving decisions any longer than the emergency situation necessitates.

. . . .

That nothing was done to make medical help available to Mueller for over six hours only underscores the fact that Stephani was not responding as if to an emergency. Based on the undisputed facts in this case, the Switlicks thus did not provide any care that would entitle them to immunity from liability under Wis. Stat. § 895.48.[9]

## II

¶ 19. The dispositive issue in the present case requires us to interpret and apply Wis. Stat. § 895.48(1), the Good Samaritan statute, to the undisputed facts of the case.

¶ 20. The interpretation and application of a statute is ordinarily a question of law that this court decides independent of the circuit court and the court of appeals but benefiting from their analyses.

¶ 21. Because this case was decided on summary judgment and the material facts are not in dispute, we follow the standard of review set forth in Wis. Stat. § 802.08. We determine whether the circuit court correctly decided an issue of law, namely the interpretation and application of the applicable statute, in its decision on the summary judgment motion.[10]

---

[9] *Mueller,* 287 Wis. 2d 154, ¶¶ 29, 35.

[10] *Prince v. Bryant,* 87 Wis. 2d 662, 666, 275 N.W.2d 676 (1979).

## III

¶ 22. Wisconsin Stat. § 895.48(1) states in relevant part:

> Any person who renders emergency care at the scene of any emergency or accident in good faith shall be immune from civil liability for his or her acts or omissions in rendering such emergency care.

¶ 23. The statute sets forth three elements:

(1) Emergency care must be rendered *at the scene of the emergency;*

(2) The care rendered must be *emergency care;* and

(3) Any emergency care must be rendered *in good faith.*

██

¶ 24. If all three elements are met, the alleged tortfeasor "shall be immune from civil liability for his or her acts or omissions in rendering such emergency care."[11] If any element is not met, the alleged tortfeasor is not entitled to immunity under the Good Samaritan statute.

## A

¶ 25. We first examine the requirement that the emergency care must be rendered at the "scene of any emergency or accident." The incident during which the injury occurred took place in the woods. The Switlicks were not present at that time or place of the incident; they rendered care to the plaintiff when she returned to the Switlicks' home after the incident.

¶ 26. This court has not had the opportunity to determine the scope of the term "scene of any emer-

---

[11] Wis. Stat. § 895.48(1).

gency or accident." "Scene of any emergency" is not defined in the Good Samaritan statute.

¶ 27. First, "scene of any emergency" must be broader than "scene of any accident." If "scene of any emergency" meant the same thing as "scene of any accident," the word "accident" would be surplusage. "A statute should be construed so that no word or clause shall be rendered surplusage and every word if possible should be given effect."[12]

¶ 28. We find additional help in determining the meaning of "scene of any emergency" by examining the statutory history. Prior to 1977, when the statute protected only licensed medical workers, the statute contained the following definition of "scene of an emergency:"

> "[T]he scene of an emergency" means areas not within the confines of a hospital or other institution which has hospital facilities or the office of a person licensed or certified under this chapter.[13]

¶ 29. Under this definition, the scene of an emergency was anywhere that emergency care was provided outside of a hospital or office of a licensed or certified person. This definition, which was not included when the legislature adopted the present Good Samaritan statute, was obviously targeted at medical professionals, but it is helpful to our analysis.

¶ 30. Also helpful in determining the meaning of "scene of any emergency" is the purpose of the current

---

[12] *Donaldson v. State*, 93 Wis. 2d 306, 315, 286 N.W.2d 817 (1980).

[13] Wis. Stat. § 448.04 (1975–76).

Good Samaritan statute. The purpose of the statute is to encourage individuals to provide emergency care to an injured person by immunizing the caregivers from common-law liability if they fail to exercise reasonable care when rendering emergency care in good faith. The circuit court reasoned that to meet this statutory purpose, the scene of any emergency or accident should "follow the person in peril and in need of emergency care. It covers the farmer that answers the door to find the victim of an automobile accident who was able to make it to his door or the driver finding a hunter who, after falling from his deer stand, crawls out to a highway with his broken leg. The fact that the site of the accident is some distance away does not reduce an injured person's need for assistance."

¶ 31. We agree with the circuit court that the phrase "scene of any emergency" should ordinarily be interpreted to cover emergency care at a location where such care is needed.

¶ 32. Taking into account the text, the statutory history, and the purpose of the Good Samaritan statute, we conclude that, whatever the precise scope of "scene of any emergency or accident," the phrase "scene of any emergency" is sufficiently broad to include the Switlicks' home where the injured, bleeding plaintiff arrived after the ATV incident. "Scene of any emergency" is sufficiently broad to include in the present case not only the place where the incident or injury occurred but also the place to which the plaintiff was moved. As the circuit court stated, the "scene of any emergency" may follow the injured person.

¶ 33. We therefore conclude that the initial evaluation and immediate assistance, treatment, and inter-

vention rendered by the Switlicks at their home occurred at the "scene of any emergency."[14]

## B

¶ 34. We next examine the second element of the Good Samaritan statute, namely emergency care. Wisconsin Stat. § 895.48(1) makes immunity contingent upon the rendering of emergency care. The word "emergency" describes the nature of the care. The statute does not, however, define "emergency care."[15]

[14] This conclusion is consistent with that of other state courts that have addressed this issue. *See, e.g., Swenson v. Waseca Mut. Ins. Co.,* 653 N.W.2d 794, 799 (Minn. Ct. App. 2002) (scene of the emergency includes motor vehicle used by Good Samaritan to transport injured person to hospital).

The concurring judge in the court of appeals concluded that the Switlicks did not provide emergency care at the scene of any emergency or accident. The judge was bothered by the time factor, raising the question how the concept that the scene of any emergency travels with the injured party "pertains to the entire time after Mueller was injured until she was placed in the ambulance some eight hours later." *Mueller,* 287 Wis. 2d 154, ¶ 45 (Hoover, J., concurring).

[15] Two states, Oklahoma and Oregon, have defined the term "emergency care" as used in their Good Samaritan statutes.

Under Oklahoma law, emergency care consists only of "artificial respiration, restoration of breathing, or preventing or retarding the loss of blood, or aiding or restoring heart action or circulation of blood to the victim or victims of an accident or emergency . . . ." Okla. Stat. Ann. tit. 76, § 5(a)(2) (2005).

Oregon Rev. Stat. § 30.800(1) (2003) defines emergency care as follows:

(a) Medical or dental care not provided in a place where emergency medical or dental care is regularly available, including but not

¶ 35. The circuit court declared that emergency care includes medical assistance and first aid. The court of appeals concluded that when the Good Samaritan is a layperson, the intervention will ordinarily be of short duration and of an interim sort.[16]

¶ 36. We cannot define "emergency care" with a bright-line rule because of the great variety of situations that may qualify as emergency care. We shall, however, attempt to provide a flexible, broad working definition of emergency care that is suitable for the present case and may be suitable for a multitude of other cases.

¶ 37. We start by defining "emergency," which means a sudden, unexpected happening or unforeseen occurrence or condition. "Emergency medicine" means the evaluation and initial, rapid treatment of medical conditions caused by trauma or sudden illness. A working definition of "emergency care" in Wis. Stat. § 895.48(1) (as it applies to a layperson) therefore would be care rendered by a layperson in a sudden, unexpected happening, occurrence or situation that de-

limited to a hospital, industrial first-aid station or a physician's or dentist's office, given voluntarily and without the expectation of compensation to an injured person who is in need of immediate medical or dental care and under emergency circumstances that suggest that the giving of assistance is the only alternative to death or serious physical after effects; or

(b) Medical care provided voluntarily in good faith and without expectation of compensation by a physician licensed by the Board of Medical Examiners for the State of Oregon in the physician's professional capacity as a team physician at a public or private school or college athletic event or as a volunteer physician at other athletic events.

[16] *Mueller*, 287 Wis. 2d 154, ¶ 29.

mands immediate action until professional medical attention is available. "Care" includes the evaluation, intervention, assistance, and treatment of, or intervention on behalf of the injured person, or response to medical conditions caused by an accident, trauma, or sudden illness.

¶ 38. This working definition of emergency care is bolstered by the purpose of Wis. Stat. § 895.48(1), as evidenced by the evolution of our Good Samaritan statute.[17]

¶ 39. The original Good Samaritan statute, enacted in 1963,[18] provided immunity only to medical professionals who rendered emergency care.[19] In 1977 a Good Samaritan statute was adopted to extend Good

---

[17] Good Samaritan laws of one type or other have been enacted in most if not all states. For discussions of state Good Samaritan laws and cases interpreting the statutes, *see, e.g., Velazquez v. Jiminez,* 798 A.2d 51, 57–61 (N.J. 2002); W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 56, at 378 (5th ed. 1984); Eric A. Brandt, Comment, *Good Samaritan Laws— The Legal Placebo: A Current Analysis,* 17 Akron L. Rev. 303 (1983); Danny R. Veilleux, *Construction and Application of "Good Samaritan" Statutes,* 68 A.L.R. 4th 294 (1989).

[18] *See* ch. 46, Laws of 1963.

For discussions of the Wisconsin Good Samaritan law, see David A. Suemnick, Comment, Wisconsin's "Good Samaritan" Statute, 48 Marq. L. Rev. 80 (1964); Dawn B. Lieb, Note, *The Good Samaritan Statute,* 62 Marq. L. Rev. 469 (1978).

[19] See Wis. Stat. § 147.17(7) (1965) (providing immunity to doctors), which states, "No person licensed under this section, who in good faith renders emergency care at the scene of an emergency, is liable for any civil damages as a result of acts or omissions by such person in rendering the emergency care." *See also* Wis. Stat. § 149.06(5) (providing the identical immunity to nurses).

Samaritan protection to laypersons.[20] In all respects relevant to the issue presently before the court, the statute has remained unchanged since 1977.

¶ 40. A consistent purpose of the Wisconsin Good Samaritan statute has been to encourage prompt care in an emergency until professional medical care can be obtained.

¶ 41. The Legislative Council analysis of Assembly Bill 96, which ultimately became the Good Samaritan statute, states that the purpose of the bill was to overcome the "reluctance on the part of the general public to 'get involved' . . . ."[21] The Legislative Council analysis goes on to state that the result of such reluctance is that "emergency treatment is often *delayed* or denied to many persons involved in accidents or who have suffered serious injury."[22] The Legislative Council staff thus concluded that Assembly Bill 96 "would help eliminate this situation and would encourage the public to come to the aid of persons involved in accidents who need *prompt* emergency care. As a result, many lives can be saved, and serious injury or disability can potentially be minimized."[23]

---

[20] *See* § 3, ch. 164, Laws of 1977.

[21] Bill History, Bill Analysis prepared by Legislative Council Staff, at 2 (1977) (on file with Legislative Council, Madison, Wis.).

[22] *Id.*(emphasis added).

[23] *Id.*(emphasis added).

Section 895.48 is consistent with the national trend to mitigate the common law that dissuades volunteers from assisting an injured person by removing the fear of civil liability for prompt and immediate care. *See Street v. Superior Court,* 274 Cal. Rptr. 595, 598 (Cal. Ct. App. 1991) ("Good Samaritan

¶ 42. At least one industry group, the Allied Construction Employers Association, agreed with this analysis of the Good Samaritan statute. In a letter to the Senate committee reviewing the Good Samaritan law prior to its 1977 passage, counsel for the Association stated: "[A]n important *benefit* of AB-96 is that it would encourage workers at a construction site to provide emergency first aid to an injured fellow worker until better health care services are available."[24]

¶ 43. In addition, a law review commentator has suggested that the purpose of the Good Samaritan statute is

> to encourage lay persons and professionals to respond to another's need for help by granting limited immunity for negligent acts which might occur while rendering emergency assistance. The omnibus wording of the current Wisconsin [G]ood [S]amaritan statute results from the legislature's determination that abrogation of potential tort liability for both professionals and lay persons would encourage more individuals to voluntarily assist others.[25]

statutes of the type at issue here have been enacted in virtually every state since California initiated the concept in 1959. Their purpose is to eliminate the perceived inadequacies of the common law, under which a volunteer, choosing to assist an injured person, although having no duty to do so, could be held liable for negligence in providing such assistance."); Veilleux, *supra* note 17, § 2[a] ("After the first Good Samaritan statute was passed in 1959, all states have enacted some form of the legislation.").

[24] Letter from Tony Driessen, counsel for Allied Construction Employers Ass'n, to Senator James T. Flynn (chair) and Members of the Senate Judiciary and Consumer Affairs Committee (June 13, 1977), at 1 (on file with Legislative Council, Madison, Wis.).

[25] Lieb, *supra* note 18, at 470–71.

¶ 44. In reaching this conclusion, the law review commentator quotes from a letter to her from Representative J.F. Rooney (whom the commentator refers to as the principal author of Assembly Bill 96). Representative Rooney described the purpose of the statute as follows:

> In answer to your first question as to why we expanded the scope of the original [G]ood [S]amaritan statutes; it was felt that our society has become "sue happy" and therefore many citizens who might otherwise go to the aid of a fellow human being do not because of the fear of being sued for trying to help. By elimination of the threat of lawsuit, more people would be apt to aid a victim.[26]

¶ 45. A consistent theme runs through these various sources. The decision to extend Good Samaritan immunity beyond medical professionals reflects the legislative determination that the removal of potential

---

Another commentator suggested that the purpose of the predecessor to the current statute, which provided immunity only to medical professionals, was "to provide for the public welfare by encouraging doctors and nurses to render emergency care to accident victims at the *scene* of the accident." Suemnick, *supra* note 18, at 81.

[26] Letter from J.F. Rooney to Dawn B. Lieb (Aug. 23, 1978) (on file with Marquette Law Review) (cited in Lieb, *supra* note 18, at 471 n.9).

*See also* Veilleux, *supra* note 17, § 2[a] ("The primary purpose of the [Good Samaritan] statutes is to encourage prompt emergency care by granting immunity from civil damages and removing the fear of liability. The statutes generally attempt to eliminate the perceived inadequacies of the common-law rules, under which a volunteer, choosing to assist an injured person although having no duty to do so, was liable for failing to exercise reasonable care in providing the assistance.").

tort liability would encourage more individuals to provide immediate assistance when professional medical assistance is not available. This emphasis on immunity for initial and immediate care reflects the legislative purpose to encourage such services as are necessary to stabilize an injured individual's health or impede an impending tragedy during the period before care can be transferred to professional medical personnel.

¶ 46. In sum, as we have explained, "emergency care" under the statute refers only to the initial evaluation and immediate assistance, treatment, and intervention at the scene of an emergency during the period before care can be transferred to professional medical personnel.

¶ 47. We therefore turn to the question whether the Switlicks' care of the plaintiff constituted emergency care under Wis. Stat. § 895.48(1).

¶ 48. In determining the immunity and liability, if any, of the Switlicks, the conduct of each must be separately examined, although we refer to both Switlicks as a unit for ease of reference.

¶ 49. When the plaintiff returned to the shack bloodied and vomiting, both Mr. and Ms. Switlick may have been involved in the initial assessment of her injuries, the immediate assistance, treatment, and intervention, and the decision not to seek immediate professional medical assistance. Ms. Switlick continued to monitor the plaintiff during the night. The record is not clear whether Mr. Switlick rendered care after the initial period.

¶ 50. Arguably, Mr. Switlick's care may have ended when he finished the assessment, and he did not interact with the plaintiff again. Because the Good

Samaritan statute does not apply to any acts or omissions that occurred while not providing emergency care, it similarly will not protect Mr. Switlick for any acts or omissions that occurred after he ceased providing care altogether.

¶ 51. On the other hand, Ms. Switlick's periodic monitoring of the plaintiff may have been the part of a joint effort by the Switlicks to care for the plaintiff, in which case Mr. Switlick would be entitled to Good Samaritan protection to the same extent as Ms. Switlick.

¶ 52. In evaluating the plaintiff's condition and rendering to the plaintiff immediate assistance, treatment, and intervention, the Switlicks may have been rendering emergency care. It is undisputed, however, that professional assistance could have been summoned immediately after the plaintiff arrived at the house, or at least immediately after the initial evaluation of the plaintiff. Instead of summoning professional medical assistance, the Switlicks determined that the circumstances did not require trained medical professionals, and they decided to, and did, provide ongoing care for the plaintiff throughout the night.

¶ 53. The Switlicks cared for the plaintiff longer than the initial evaluation and immediate assistance, treatment, and intervention and for longer than necessary to transfer care to professional medical personnel. Therefore, after the initial evaluation and immediate assistance, treatment, and intervention that constituted emergency care, the Switlicks' assistance, treatment, and intervention changed from "emergency care" to "non-emergency care." The care the Switlicks rendered to the plaintiff during the six- to seven-hour period after their initial evaluation and immediate assistance, treatment, and intervention was not emer-

gency care. It was just plain non-emergency care that is not immunized under the Good Samaritan statute and may be subject to a negligence suit.

¶ 54. The Switlicks argue that limiting Good Samaritan immunity to the period necessary to transfer the injured person's care to professional medical personnel thwarts the purpose of the statute and has the perverse effect of discouraging responses by creating uncertainty about whether immunity applies. The legislature, however, limited immunity to emergency care. In doing so, the legislature has balanced the public policy of encouraging individuals to provide assistance to those in need of immediate help with the competing public policy of encouraging caregivers to seek professional medical assistance. The statute limiting immunization to emergency care encourages caregivers to act without eviscerating protection to those who are in need of care.

\* \* \* \*

¶ 55. We hold that whatever the precise scope of "scene of any emergency or accident" in Wis. Stat. § 895.48(1), the phrase "scene of any emergency" is sufficiently broad to include the Switlicks' home where the injured, bleeding plaintiff arrived after being hurt in an incident involving an all-terrain vehicle (ATV) in the woods. We further hold that, in the circumstances of the present case, "emergency care" under § 895.48(1) refers to the initial evaluation and immediate assistance, treatment, and intervention rendered to the plaintiff during the period before care could be transferred to professional medical personnel.

¶ 56. We therefore agree with the court of appeals that the Switlicks are not entitled to Good Samaritan

immunity for their extended care of the plaintiff. While the Switlicks' initial evaluation and immediate assistance, treatment, and intervention constituted emergency care, the care rendered by the Switlicks after the initial evaluation and immediate assistance, treatment, and intervention for longer than the period necessary to transfer care to professional medical personnel does not constitute "emergency care." When the Switlicks did not seek professional medical assistance after the initial evaluation and immediate evaluation, assistance, treatment, and intervention, emergency care ceased and non-emergency care began. The Switlicks have not asserted a valid Good Samaritan defense to the plaintiff's negligence claims against them for non-emergency care.

¶ 57. For the reasons set forth, the decision of the court of appeals is affirmed and the cause is remanded to the circuit court to determine whether the Switlicks are liable for negligent non-emergency care.

*By the Court.*—The decision of the court of appeals is affirmed.