IN the MATTER OF GUARDIANSHIP OF CHERYL F.:
CHERYL F., Appellant,

v.

SHEBOYGAN COUNTY, Respondent.

Court of Appeals

*No. 92-0218. Submitted on briefs June 10, 1992.—Decided July 29, 1992.*

(Also reported in 489 N.W.2d 636.)

On behalf of the appellant, the cause was submitted on the brief of *Frederick P. Wilk* of Sheboygan.

On behalf of the respondent, the cause was submitted on the brief of *Douglas Leppanen,* assistant corporation counsel.

Before Nettesheim, P.J., Brown and Snyder, JJ.

BROWN, J. This is an appeal of an order appointing Sheboygan's Advocacy Programs of Family Services as permanent guardian of Cheryl F.'s person and estate and ordering the provision of protective services. Cheryl notes that a guardianship can be ordered only if the court finds incompetency by clear and convincing evidence. She contends that the evidence here failed to establish her incompetence. We conclude that the trial court based its decision on the correct standard and the evidence supports a finding of incompetence. Therefore, we affirm.

At the time of the court proceedings, Cheryl was twenty-one years old and had been previously diagnosed

as permanently mentally retarded because of her border-line intellectual functioning and testing and poor overall adaptive behavior skills. The county's petition for guardianship alleged that Cheryl had an "impaired ability to make informed personal and financial decisions" due to her developmental disability. The county also alleged that she needed protective services because she required "independent living training and supportive employment." The petition further stated that she placed herself at "substantial risk of neglect to health and also to be taken advantage of due to her inability to understand consequences."

At trial, a psychologist testified that Cheryl's mental functioning was from low borderline to mildly retarded, she was lacking in responsibility, she could not adequately make decisions for financial management or budgeting, and she was likely to make weak decisions concerning her personal needs. He also testified that he had evaluated Cheryl when she was still in high school and that she had done better at that time because her parents provided her with supervision and assistance and the educational program provided her with structure. His opinion was that Cheryl was in need of a guardian and would benefit from protective services. However, he predicted that, with good adaptive programming, eventually Cheryl would be able to manage on her own. There was no other expert psychological or medical testimony.

The county's developmental disability specialist testified that Cheryl was a high school graduate with a diploma from the special education program. He did not believe Cheryl was capable of caring for herself without assistance for the following reasons. She quit her job to spend more time with her friends. She made poor financial decisions, such as paying for all the utilities and food

for her roommate, and this caused her financial hardship. She did not seem to appreciate the danger of unsafe conditions, such as riding her bike after dark or living in an apartment with a leaky gas stove. She previously had rapid weight loss of fifteen pounds, although she had gained some of the weight back by the time of trial. She maintained poor personal hygiene, such as not brushing her teeth and sometimes not bathing for several weeks. She was unwilling to accept the assistance her parents tried to provide, such as advice regarding financial matters, living situations, and nutrition.

Cheryl testified that she quit her job as a dishwasher because it was causing her to have a skin rash. She also testified that she and her roommate planned to move to a new apartment without a gas leak, but admitted she did not know how much money she had for the move or how she was going to support herself financially. She testified that she was looking for a job on her own, but indicated she was not willing to work voluntarily with the county's supportive employment program.

The guardian *ad litem* recommended that the court appoint a guardian and order protective services. She also told the court that this was a "very clear case of incompetency" and a "very clear case that [Cheryl would] harm herself," given the facts of weight loss and nutritional and hygiene problems.

The trial court found that Cheryl has an "impaired ability to make informed personal and financial decisions . . . .. [She] is not fully capable of providing for her own care so as to provide a substantial risk of harm to herself if she were left to fend for herself." On that basis, the court concluded that she was in need of a guardian of her person and estate. It also ordered protective services. The court then stated its belief that Cheryl would be able to make it on her own with a little bit of help, but that

"at this point in her life . . . that's probably the best thing for her and in her best interest."

■■

The issue is whether the evidence fulfills the legal standard for incompetency. Whether the facts fulfill a particular legal standard is a question of law. *Nottelson v. DILHR,* 94 Wis. 2d 106, 116, 287 N.W.2d 763, 768 (1980). We review questions of law *de novo* without deference to the trial court. *First Nat'l Leasing Corp. v. City of Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

■■

A court can appoint a guardian for a person in Cheryl's circumstances only if she is incompetent. *See* sec. 880.03, Stats. Section 880.01(4), Stats., states:

> "Incompetent" means a person adjudged by a court of record to be substantially incapable of managing his [or her] property or caring for himself [or herself] by reason of infirmities of aging, developmental disabilities, or other like incapacities.

The burden was on Sheboygan county to establish by clear and convincing evidence that Cheryl was incompetent.

The evidence shows that Cheryl met the statutory definition of a developmentally disabled person. That definition is found in sec. 880.01(2), Stats., which states in relevant part:

> "Developmentally disabled person" means any individual having a disability attributable to mental retardation . . . which has continued or can be expected to continue indefinitely, substantially impairs the individual from adequately providing for his or her own care or custody and constitutes a substantial handicap to the afflicted individual. The

425

term does not include a person affected by senility which is primarily caused by the process of aging or the infirmities of aging.

Cheryl was diagnosed as mentally retarded by a psychologist who had seen her when she was in high school, well before the initiation of this guardianship petition. The psychologist testified at this hearing and stated that Cheryl lacked responsibility and could not care adequately for herself without supervision.

Similarly, the developmental disability specialist testified that Cheryl could not care for herself, and he supported this opinion with a number of examples, including some which implicated Cheryl's safety. He also testified that Cheryl would not voluntarily accept assistance. Cheryl's guardian *ad litem,* whose task was to represent Cheryl's best interests, also linked her recommendation for a guardianship to concerns about Cheryl's safety, stating that she believed Cheryl would harm herself if left on her own.

The testimony of these witnesses is clear and convincing evidence that Cheryl could not care for herself or manage her property by reason of her developmental disability. This evidence supports a conclusion that Cheryl was incompetent. Therefore, the trial court properly ordered a guardian of her person and estate even though the court did not explicitly conclude that Cheryl was incompetent.

Cheryl argues that the trial court appointed a guardian not because it found her incompetent but because it concluded that a guardian was in her best interest. We disagree. The court's statement about a guardian being in Cheryl's best interest was simply compassionate *dicta* coming at the end of the court's legal decision. The

court's appointment of the guardian came immediately after it stated that Cheryl had an impaired ability to make personal and financial decisions and that she posed a substantial risk of harm to herself if left on her own. Thus, the court implicitly based its decision on a finding that Cheryl was incompetent.

Cheryl also cites *In re Streiff,* 119 Wis. 566, 570, 97 N.W. 189, 191 (1903), and *In re Guardianship of Mills,* 250 Wis. 401, 405, 27 N.W.2d 375, 377 (1947), for the proposition that incompetency means "substantially total" mental incapacity.[1] The court's statement in those cases was based on the statutes existing at the time of the case. *See* sec. 3976, Stats. (1898), and sec. 319.01, Stats. (1947). Moreover, the 1947 statutes relied upon by *Mills* explicitly stated in the official note accompanying the statute that "mentally incompetent" means "mental incapacity substantially total." Note, 1935, sec. 319.01, Stats. (1947).

■ The relevant wording in our current statute dates from 1973. *See* sec. 16, ch. 284, Laws of 1973. The current statute does not say that the incapacity must be "substantially total" but that a person must be "substantially incapable" of caring for himself or herself to be considered incompetent. Section 880.01(4), Stats. The evidence in the instant case showed that Cheryl was "substantially incapable" of caring for herself and thus the appointment of a guardian was appropriate.

---

[1] The above cases each concerned a guardianship proceeding for an elderly person. *See In re Streiff,* 119 Wis. 566, 97 N.W. 189 (1903), and *In re Guardianship of Mills,* 250 Wis. 401, 27 N.W.2d 375 (1947). In *Streiff,* the evidence supported the conclusion that the subject of the guardianship was unable to care for her person or property, while in *Mills* there was not such evidence.

The trial court also properly ordered protective services for Cheryl because sec. 55.05(2)(d), Stats., provides that a court "may order protective services for an individual for whom a determination of incompetency is made under s. 880.33 if the individual entitled to the protective services will otherwise incur a substantial risk of physical harm."

*By the Court.*—Order affirmed.