Jana Kᴀɪɴᴢ,
Plaintiff-Appellant,

Mᴜᴛᴜᴀʟ ᴏꜰ Oᴍᴀʜᴀ Iɴsᴜʀᴀɴᴄᴇ Cᴏᴍᴘᴀɴʏ,
Plaintiff,

v.

Mary Iɴɢʟᴇs and General Casualty Company of
Wisconsin, Defendants-Respondents.

Court of Appeals

*No. 2006AP963. Submitted on briefs January 3, 2007.
—Decided March 13, 2007.*

2007 WI App 118

(Also reported in 731 N.W.2d 313.)

670

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jeff Scott Olson* of *The Jeff Scott Olson Law Firm, S.C.*, of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Donald H. Piper* and *Allen M. Ratkowski* of *Piper & Schmidt* of Milwaukee.

Before Fine, Curley and Kessler, JJ.

¶ 1. CURLEY, J. Jana Kainz appeals from the judgment entered following her guardian *ad litem*'s acceptance, and the trial court's approval, of a $125,000 settlement offer from Mary Ingles and General Casualty Company of Wisconsin (General Casualty). Kainz also appeals the underlying decision finding her incompetent for purposes of these proceedings and authoriz-

ing her guardian *ad litem* to accept the settlement offer on her behalf under Wis. Stat. § 807.10 (2003–04).[1] The main issue before us is one of first impression and asks us to determine the proper competency standard under § 807.10. We must also decide whether the trial court properly concluded that Kainz's mental health problems rendered her incompetent.

¶ 2. Kainz contends that: (1) the question of whether she was competent should be reviewed as a question of law; (2) she should not have been declared incompetent because she would not have been found incompetent under any of the three possible competency standards set forth in Wis. Stat. § 880.01(4), Wis. Stat. § 971.13, and SCR 20:1.14, and because the competency standard used by the trial court is not properly supported by law and is too broad; and (3) her choice not to accept the settlement was "not completely irrational" because even though one estimate was that her damages were worth $50,000, there was some evidence indicating that she could have been awarded more than the $125,000 settlement offer.

■

¶ 3. We conclude that: (1) the question of competency under Wis. Stat. § 807.10 is a question of fact; (2) the standard used by the trial court to determine competency under § 807.10, whereby a person is incompetent if he/she lacks the ability to reasonably understand pertinent information, rationally evaluate litigation choices based upon that information, or rationally communicate with, assist and direct counsel, was well-reasoned and proper, and we therefore adopt it and determine that the trial court properly found Kainz

[1] All references to the Wisconsin statutes are to the 2003–04 version unless otherwise noted.

incompetent under this standard; and (3) the unlikely possibility that a jury might have awarded Kainz more than the amount of the settlement offer does not make her decision to reject it rational. Accordingly, we affirm.

## I. BACKGROUND.

¶ 4.   On May 12, 2000, Kainz and Ingles were involved in a car accident. Kainz sued Ingles and Ingles's insurer, General Casualty (collectively, Ingles), alleging that Ingles's negligence was the cause of the accident. The parties attempted to resolve the dispute via mediation, but Kainz refused to accept Ingles's offer. It is undisputed that Ingles's negligence was the cause of the accident.

¶ 5.   On February 2, 2005, at what was intended to be a final pretrial, the attorneys informed the court that, based on Kainz's behavior during previous proceedings, there was a significant issue with respect to her mental health status. The court ordered Kainz to undergo a psychiatric evaluation by an independent evaluator to determine whether a guardian *ad litem* should be appointed. Dr. Donald Feinsilver was selected to conduct the evaluation. Dr. Feinsilver issued a comprehensive report based on his evaluation of Kainz, the results of a number of psychological tests, and a review of Kainz's medical and psychological records.[2] He diagnosed Kainz with "severe psychiatric illness," specifi-

---

[2] In his report, Dr. Feinsilver described the information Kainz told him, including that:
- Kainz wants to "stay away from everybody," referring to "church people" who try to hurt her emotionally;
- "[t]hey" broke into her house and stole things and she thinks someone was definitely going after her; she goes to beauty salons and they dye her hair "blond or red or

cally: (1) delusional disorder, that is, "fixed beliefs that are contrary to reality and unchangeable by reason or

> black" against her will, she had been to ten different beauty salons that all do the same thing;
>
> - there is a "global positioning device on [her] car" and there might be one in her vagina, as a result of which "they know where [she's] at. They then may contact the hair gallery . . . or the guys in the bar";
> - people also know where she is because she "had dental work [and] they put an implant in [her] tooth, they know what [she has] been saying" and figured that "maybe they paid off the dentist";
> - she feels her "phones are being tapped the beauty salons are contacted they tell them to do the opposite of what [she] says"—"they" were "[t]he insurance company or friends";
> - "[t]hey" put Silly Putty in her dryer and she called the police to report it and the police had asked her if she sees a psychiatrist and thought it was "no big deal . . . just a dryer," but that she "was worried the house would be burned down";
> - "[t]hey stole [her] mother's yearbooks" and it may be "an old boyfriend, family members," the "harassment" had accelerated since the accident;
> - her lawyer might be orchestrating this "[t]o make things more profitable for his situation" and "[m]ore profitable . . . like it's a conspiracy theory";
> - she feels her current situation is "hell, demoralizing, inhumane, torture . . . devastating";
> - she was bit by a bat but she "cleaned out [her own] system by taking Chlorophyll";
> - "a crown [over a tooth] broke" and gave her mercury poisoning;
> - she has a "medical condition that comes from having a job" and "losers and bums . . . they are so much more intelligent" because "[t]hey've mastered the art of life and happiness," and "[n]ext time [she]'ll be cruel, [she]won't

676

logic," which in Kainz's case include conspiracies that involve hairdressers dyeing her hair against her will and people implanting global positioning devices into her body; (2) somatoform disorder, that is, physical symptoms where the reported distress and dysfunction is greater than would be expected from the objective physical findings; and (3) personality disorder with paranoid features, which in Kainz manifests itself as a pervasive distrust and suspiciousness of others, where their motives are interpreted as malevolent, such as her paranoia that the insurance company she is suing and her lawyer were out to get her. Dr. Feinsilver also concluded that "[t]he motor vehicle accident of May 12, 2000, has no relation to any of these diagnoses or to Jana Kainz's current psychiatric status or problems," and that the "accident is simply serving as a convenient focus for attribution."

¶ 6. Based on Dr. Feinsilver's report, the trial court ordered the appointment of a guardian *ad litem* for Kainz and ordered that the case be re-mediated. During mediation, Ingles offered to settle the case for $125,000. Kainz rejected the offer. The guardian *ad litem* recommended to Kainz that she accept it, and after reviewing the file, the mediator also made the same recommendation, but Kainz declined.

¶ 7. The defense then moved the court to give the guardian *ad litem* the power to settle the case on Kainz's behalf, pursuant to Wis. Stat. § 807.10(1), which provides in relevant part that "[a] . . . settlement of an action or proceeding to which a . . . mentally incompetent person is a party may be made by the general guardian, if the guardian is represented by an

---

work, like those people, [she] was brain-washed . . . [she's] in the situation [she's] in because [she] was a good person."

677

attorney, or the guardian ad litem with the approval of the court."[3] On December 6, 2005, the trial court issued a written order deferring a ruling on the motion pending a determination of Kainz's competency, and ordered a competency hearing. In issuing this decision, the court noted that § 807.10 does not define mental incompetence, but after discussing possible standards, deduced "three core concepts" for determining competency: (1) the "ability to reasonably understand pertinent information"; (2) the "ability to rationally evaluate litigation choices based upon that information"; and (3) the "ability to rationally communicate with, assist and direct counsel," and explained that if the person lacks any of the three, he or she is mentally incompetent. The court also explained that similar to the process used in criminal cases, *see* WIS. STAT. § 971.14, the process for determining competency was to be an adversarial hearing before the court.

¶ 8. On January 20, 2006, the court conducted the competency hearing. At the hearing, Kainz was called adversely by Ingles's attorney. Kainz testified that since the accident she had reported to the local Sheriff's

---

[3] WISCONSIN STAT. § 807.10(1) was amended by 2005 Wis. Act 387, § 238, effective December 1, 2006, to read:

(1) A compromise or settlement of an action or proceeding to which a minor or individual adjudicated incompetent is a party may be made by the guardian, if the guardian is represented by an attorney, or the guardian ad litem with the approval of the court in which such action or proceeding is pending.

The changes from "mentally incompetent person" to "individual adjudicated incompetent" and from "general guardian" to "guardian" do not, however, affect our analysis because the relevant proceedings took place before the amendment came into effect and because the relevant word "incompetent" remains in the statute.

Department that she suspected that her vehicle had been, without her permission, equipped with tracking devices, and that she was being followed. She also testified that she thought someone from the insurance company she was suing might be following her and bugging her vehicle. She stated that she had contacted the Sheriff's Department to report that the insurance company had tapped her phone and that people had broken into her home and stolen things, including her mother's yearbook, and put Silly Putty in her dryer to cause a fire. She testified that someone is contacting her beauty salons before her appointments, telling the people at the salon to do the opposite of what she asks them to do when coloring her hair. She stated that global positioning devices have been placed in her vagina, that a tracking device may be in her tooth, and that she has been under helicopter surveillance, all things likely requested by someone either at the hair salon or the insurance company. She also stated that she underwent a procedure called "vaginal palpitation" where "the therapist went into [her] vagina to straighten out the coccyx" and that she saw a nutritionist who she thought was "an occult" and "might be a witch." She testified that she had seizures and memory problems that were caused by either a bat bite or mercury poisoning from a broken crown, and that following the bat bite, she cleaned out her own body by taking chlorophyll. When asked by Ingles's attorney whether she believed all of the above-mentioned events in fact happened to her, she responded that she did.

¶ 9. The court asked Kainz why she rejected the settlement offer and Kainz responded that she believed the accident had caused turmoil in her life and she did not feel the $125,000 that had been offered compensated her adequately for her suffering.

¶ 10. Dr. Feinsilver was called to testify based on his evaluation of Kainz. As to Kainz's ability to rationally evaluate litigation decisions, Dr. Feinsilver indicated that "although she retains many capabilities and can look at many things in a logical manner there is overwhelming contamination of delusion," and that she therefore does not have the ability to reasonably and rationally evaluate information for purposes of intelligently choosing between the litigation alternatives available to her. Dr. Feinsilver expressed a belief that Kainz was unable to separate her own delusions from reality or to cooperate with and assist her lawyer because Kainz had indicated that her lawyer was part of a conspiracy against her.

¶ 11. Kainz's guardian *ad litem* also addressed the court. He indicated that he agreed with Dr. Feinsilver's diagnosis and stated that he had personally heard from Kainz about many of her unusual beliefs, including her conviction that the insurance company and hairdressers are harassing her. He then applied the three-factor standard previously set forth by the trial court to the facts of Kainz's case. As to the first, whether Kainz had the "ability to reasonably understand pertinent information," he felt she did. As to the second factor, an "ability to rationally evaluate litigation choices based upon that information," he felt that she did not. He told the court that Kainz had informed him that she believed the accident was intentionally set up to injure her by her sister's former boyfriend who knew where she was as a result of the global positioning devices, and that she wanted the jury to be aware of this. He also indicated that he had asked Kainz how much she thought her case was worth, and that she had responded that it was worth between fifty and one hundred million dollars. Finally, regarding the third factor,

whether Kainz had an "ability to rationally communicate with, assist and direct counsel," the guardian *ad litem* again felt that she did not. He noted that she distrusts her lawyer and appears to distrust other professionals as well, including psychiatrists, and refuses to take medications that have been prescribed to her. Accordingly, Kainz's guardian *ad litem* felt Kainz was incompetent.

¶ 12. On January 24, 2006, the court ruled that Kainz was mentally incompetent within the meaning of Wis. Stat. § 807.10(1) and granted her guardian *ad litem* the authority to settle the case on her behalf if the guardian *ad litem* were to conclude that settling for the amount offered was in Kainz's best interest. In rendering its decision, the court concluded, consistent with the guardian *ad litem*'s opinion, that Kainz satisfied the first factor—"ability to reasonably understand pertinent information"—but that she did not satisfy factors two and three, "ability to rationally evaluate litigation choices based upon that information" and "ability to rationally communicate with, assist and direct counsel." The court explained that Kainz's mental health problems are "not 'pervasive,' " but the court was nonetheless "overwhelmingly convinced that due to her paranoid delusions, she is wholly incapable of rationally evaluating litigation choices based upon pertinent and reality-based information" and is incapable of rationally communicating with and assisting her lawyer. The court added that nothing suggested that Kainz's mental health problems were caused by the car accident. Even though it felt "some hesitation," the court concluded that "these are compelling circumstances," and stated:

> The litigation choices Ms. Kainz is making are pervasively dictated by her paranoid delusions. She is wholly incapable of reasonably and rationally evaluating the

681

> fairness of the proposed settlement; the risks and benefits of trial or settlement; the recommendations of counsel; the strengths and weaknesses of the respective parties['] positions; and ultimately . . . she is incapable of "adequately considered decisions." Fairness demands that the statute be invoked under those circumstances.

(Citations omitted.)

¶ 13.   On February 17, 2006, a settlement hearing was held in response to a petition for approval of the settlement filed by Kainz's guardian *ad litem*. The guardian *ad litem* testified that because Kainz had physical and psychological complaints that existed prior to the accident, a jury might believe that some of the physical problems were aggravated by the accident and might award minor future medical expenses, but that a jury would be unlikely to believe that her mental problems were caused by the accident. He thus estimated that if the case were to go before a jury, a reasonable verdict that could be expected was between $35,000 and $50,000. Accordingly, the guardian *ad litem* recommended that Kainz accept the $125,000 offer. Kainz indicated that she completely disagreed with the guardian *ad litem*, did not want to accept the offer, and felt she deserved more because she had lost her business, and wanted the case to be tried to a jury. The court agreed with the guardian *ad litem* that it was unlikely that the verdict would exceed $50,000, and agreed that a jury would be unlikely to attribute what Kainz perceived as loss of earnings to the accident or award her the millions she believed she was entitled to.

¶ 14.   The guardian *ad litem* accepted Ingles's settlement offer of $125,000 on Kainz's behalf. On March 6, 2006, the court approved the settlement and dismissed the case. This appeal follows.

## II. Analysis.

### A. *Standard of Review*

¶ 15.   The parties disagree on the standard under which the trial court's determination of competence should be reviewed.

¶ 16.   Kainz contends that the question is one of law to be reviewed *de novo* by this court. She submits that "[t]here are opposing principles in Wisconsin case law governing the appropriate standard of review of a trial court's determination of competency." She cites *Cheryl F. v. Sheboygan County*, 170 Wis. 2d 420, 425, 489 N.W.2d 636 (Ct. App. 1992), in which the court reviewed the question of whether the evidence satisfied the legal standard of competency as a question of law. Acknowledging that the question in *Cheryl F.* involved a general guardian and not a guardian *ad litem*, and that the issue was whether the County was justified in appointing a guardian under Wis. Stat. ch. 880[4] for a mentally retarded woman, Kainz argues that "it looks like the question of whether Ms. Kainz was competent to proceed should be reviewed independently by the appellate court."

¶ 17.   She then concedes that in *State v. Garfoot*, 207 Wis. 2d 214, 558 N.W.2d 626 (1997), the Wisconsin Supreme Court came to the opposite conclusion, concluding that determinations of competency to stand trial will not be reversed unless the trial court's decision was clearly erroneous. *Id.* at 225.

¶ 18.   Kainz calls *Cheryl F.* and *Garfoot* "conflicting standards," and submits that the standard of appel-

---

[4] Wisconsin Stat. ch. 880 has since been amended and renumbered by 2005 Act 387, §§ 294–573, effective December 1, 2006.

late review depends upon whether an appellate court or a trial court "is the more appropriate and competent forum to make the decision." To that end, she maintains, citing Chief Justice Abrahamson's concurrence in *Garfoot*, that the ultimate determination of competency is a finding of constitutional fact, akin to taking away Kainz's right to a jury trial, and the appellate court should therefore independently gauge the facts but be able to draw upon the trial court's reasoning. *See id.*, 207 Wis. 2d at 230–36. Ingles disagrees and responds that *Garfoot* controls and mandates that the trial court's determination be upheld unless clearly erroneous.

¶ 19.  We agree with Ingles that *Garfoot* controls. As Kainz notes, the question in *Cheryl F.* was whether the evidence supported the appointment of a general guardian under Wis. Stat. ch. 880, whereas here, the issue was competency under Wis. Stat. § 807.10. Although in *Cheryl F.* the court reviewed *de novo* the question of whether the evidence met the standard for competency, the standard was not at issue in the case, and the court merely applied the general rule that "[w]hether the facts fulfill a particular legal standard is a question of law." *Id.*, 170 Wis. 2d at 425. In *Garfoot*, by contrast, what standard should govern review of the trial court's competency decision was a central issue on appeal. *Id.*, 207 Wis. 2d at 225.

¶ 20.  In *Garfoot*, characterizing the trial court's determination of whether the defendant is competent as a credibility determination, the court first emphasized that "[t]he trial court is in the best position to decide whether the evidence of competence outweighs the evidence of incompetence . . . [and] to make decisions that require conflicting evidence to be weighed."

684

*Id.*, 207 Wis. 2d at 222-23. The court discussed the State's burden of proving the defendant's competence as follows:

Although the court must ultimately apply a legal test, its determination is functionally a factual one: either the state has convinced the court that the defendant has the skills and abilities to be considered "competent," or it has not.

The trial court's superior ability to observe the defendant and the other evidence presented requires deference to the trial court's decision that a defendant is or is not competent to stand trial. Only the trial court has the opportunity to view the defendant. Only the trial court can judge the credibility of witnesses who testify at the competency hearing. Thus, only the trial court can accurately determine whether the state presented evidence that was sufficiently convincing to meet its burden of proving that the defendant is competent to stand trial.

*Id.* at 223. Comparing competence to stand trial to competence to represent oneself, the court "conclude[d] that the same deference should be given to the trial court regarding [its] determinations" in both circumstances, and held that "[b]ecause the trial court is in the best position to observe the witnesses and the defendant and to weigh the credible evidence on both sides, appellate courts should only reverse such determinations when they are clearly erroneous." *Id.* at 225.

■

¶ 21.   The standard articulated in *Garfoot* controls even though it emerged in the context of a criminal case, because the holding applies equally in the civil context. Moreover, because *Garfoot* was decided by the Wisconsin Supreme Court, rather than this court, which decided *Cheryl F.*, and because *Garfoot* postdates

*Cheryl F.,* the *Garfoot* court is presumed to have reached its conclusion cognizant of *Cheryl F.,* and thus, in any inconsistency between the two cases, *Garfoot* controls. We must thus review the trial court's competency determinations as a question of fact under the clearly erroneous standard.

## B. Standard for Incompetence

¶ 22. The main issue on appeal is what standard should be used to determine competency under Wis. Stat. § 807.10, and whether the standard used by the trial court was correct.

¶ 23. Wisconsin Stat. § 807.10, based on which the trial court authorized the guardian *ad litem* to accept the settlement offer on Kainz's behalf, reads:

> A compromise or settlement of an action or proceeding to which a minor or mentally incompetent person is a party may be made by the general guardian, if the guardian is represented by an attorney, or the guardian ad litem with the approval of the court in which such action or proceeding is pending.

Significantly, § 807.10 does not define "incompetent" or otherwise provide guidance as to how to determine whether an individual is incompetent.

¶ 24. On December 6, 2005, the trial court, as noted, issued a decision ordering a competency hearing and setting forth its analysis of the authority granted to a court pursuant to Wis. Stat. § 807.10. The court viewed § 807.10 as "clearly provid[ing] that the guardian ad litem may settle a civil case for their mentally incompetent ward if the court approves," and commented as follows:

> While the whole concept of substituted judgment is a troubling one, the statute clearly authorizes it in rec-

686

ognition that a mentally incompetent litigant is incapable of reasonably and rationally protecting their own interests or having charge of their affairs. See also Wis. Stats. sec. 803.01 (3) (b) 6. While it would be fundamentally unfair to deprive Ms. Kainz her [sic] of her right to trial if she competently chooses to reject settlement and pursue trial, it is likewise fundamentally unfair to deprive her of the right to a fair and reasonable settlement if her choice to reject settlement is solely a manifestation of her mental illness. Id.

(Footnote omitted.) Noting the lack of a definition for the term "incompetent," the court discussed other competency standards:

I am satisfied that the "mentally incompetent" standard of Wis. Stats. sec. 807.10 is broader than the standard of Ch. 880. If the only alternative envisioned by the statute to resolve litigation involving a mentally incompetent individual was the appointment of a general guardian the entire clause in issue in this case would be surplusage, there would no purpose in providing an alternative mechanism. The same analysis would hold true as to Wis. Stats. sec. 803.01 (3) (a).

Beyond that, the statute is of no assistance in determining the meaning of mentally incompetent in the context of civil litigation. Appointment of a guardian ad litem is authorized if there is reason to believe a party is "mentally incompetent to have charge of the party's affairs." Id. There is, of course, the arguably parallel criminal standard contained in Wis. Stats. sec. 971.13 that defines a person as incompetent if they "lack substantial mental capacity to understand the proceedings or assist in his or her own defense." A person may be stripped of their right to vote if they are "incapable of understanding the objective of the electoral process." Wisconsin Stats. sec. 880.33 (3). The ethical rules governing our practice reference inability

to make "adequately considered decisions" or "adequately act in the client's own interest." SCR 20:1.14.

(Footnote omitted.) Based on these rules, the court deduced "three core concepts" to be evaluated in assessing competency under § 807.10:

[A]ll of the above state or imply three core concepts: First, a client's ability to reasonably understand pertinent information; second, an ability to rationally evaluate litigation choices based upon that information; third, the client's ability to rationally communicate with, assist and direct counsel. If a client cannot reasonably understand the information; cannot rationally choose between available alternatives in the context of litigation; or cannot rationally communicate with, assist and direct counsel based upon pertinent information due to mental illness, even assuming the zealous assistance of counsel, the client is mentally incompetent.

(Footnote omitted.)

¶ 25.   On January 24, 2006, the trial court applied this standard to Kainz and concluded that she satisfied the first factor but not the second and third. According to the trial court, she "does have the ability to understand pertinent information," stating because "[s]he is not wholly delusional; she understands the role of the legal participants; she comprehends she has the option of proceeding to trial or accepting settlement; she is capable of understanding the basic provisions of the settlement proposal." Addressing the second factor, the court explained why Kainz did not satisfy it:

I am ... overwhelmingly convinced that due to her paranoid delusions, she is wholly incapable of rationally evaluating litigation choices based upon pertinent and reality-based information. In that respect, her delusions pervade her thought processes and render her

wholly incapable of rational evaluation and reasonable choice. As Dr. Feinsilver indicated, even her facially-rationale [sic] considerations as to the propriety of settlement (i.e. the nature of her injuries; the effect on her social life and business/employment status) are entirely interrelated to her delusion–based perceptions.

After recounting examples of Kainz's delusions from Dr. Feinsilver's report, the court made the following comment about the third factor:

> In like measure, for the very same reasons, she is incapable of rationally communicating with, assisting and directing [her lawyer]. Since Ms. Kainz is incapable of rationally evaluating litigation choices, she is, at a minimum, incapable of rationally and reasonably directing [her lawyer].

¶ 26.  Kainz disagrees with the trial court's use of this standard and contends that "the right to make one's own choices in litigation is engrained in the law," and that she therefore should not have been declared incompetent. She presents three standards that she terms "alternative possibilities" for what " 'incompetent' might mean" in the context of Wis. Stat. § 807.10: (1) Wis. Stat. § 880.01(4),[5] which sets forth the standard

---

[5] Wisconsin Stat. § 880.01(4) has been repealed by 2005 Wis. Act 387, § 298, effective December 1, 2006. The standard is now set forth in Wis. Stat. § 54.01(16) (2005–06), which provides:  " 'Individual found incompetent' means an individual who has been adjudicated by a court as meeting the requirements of s. 54.10(3)." Wisconsin Stat. § 54.10(3) (2005–06) in turn provides in part:

> (a) A court may appoint a guardian of the person or a guardian of the estate, or both, for an individual based on a finding that the individual is incompetent only if the court finds by clear and convincing evidence that all of the following are true:

used to determine whether an individual needs a general guardian and provides that a person must be "substantially incapable of managing his or her property or caring for himself or herself"; (2) WIS. STAT. § 971.13(1), which provides that a defendant is not competent to stand trial if he or she "lacks substantial mental capacity to understand the proceedings or assist in his or her own defense"; and (3) SCR 20:1.14, which relates to a lawyer's ethical obligations when dealing with a client who is suffering from a mental illness and directs a lawyer to "as far as reasonably possible, maintain a normal client-lawyer relationship" and that a lawyer may seek the appointment of a guardian or take other protective action "only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest." Kainz applies each of

1. The individual is aged at least 17 years and 9 months.

2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety.

. . . .

4. The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, or other means that the individual will accept.

(b) Unless the proposed ward is unable to communicate decisions effectively in any way, the determination under par. (a) may not be based on mere old age, eccentricity, poor judgment, or physical disability.

Because the revisions apply only to guardianship petitions filed after the effective date, the changes do not affect our analysis.

690

these standards to her case and claims she would not be considered incompetent under any of them and that the trial court therefore erred in finding her incompetent. We are not convinced.

¶ 27. First, the three standards that Kainz presents as "alternative possibilities" as to what " 'incompetent' might mean," in reality, are not "alternatives" at all. Rather, as is evident from the trial court's discussion in its December 6, 2005 decision, the three standards were explicitly considered, and in part incorporated into the final three factors. Next, Kainz makes no effort to explain *why* the trial court erred in adopting the standard it did. She also fails to explain *why* the three standards that she proposes should have been used instead of the one on which the trial court ultimately settled, and she does not explain *why* WIS. STAT. § 880.01(4) should apply outside WIS. STAT. ch. 880, why WIS. STAT. § 971.13(1) should apply outside the criminal context, and why SCR 20:1.14 should apply outside the context of a lawyer's ethical obligations. Instead, Kainz merely presents three "possibilities" and applies the facts to these "possibilities," insisting that under each of them she would not be considered incompetent. Because the trial court specifically set forth a standard, to argue for the use of different standards without explaining why and without challenging the use of the standard actually used, the arguments are not sufficiently developed and we need not address them. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals may decline to address undeveloped arguments).

¶ 28. Nonetheless, because the issue of which standard to apply when making competency determinations in the context of WIS. STAT. § 807.10 has yet to be addressed by a Wisconsin appellate court, in the

interest of clarifying the standard for future litigants and to assess the trial court's reasoning on a question of first impression, we address the applicability of the standards set forth in Wis. Stat. § 880.01(4), Wis. Stat. § 971.13, and SCR 20:1.14.

¶ 29. First, Kainz's suggestion that Wis. Stat. § 880.01(4) should be used as the standard for competence here is unconvincing. The definition of incompetence set forth in § 880.01(4) was used to determine whether an individual needs a general guardian and provides: " '[i]ncompetent' means a person adjudged by a court of record to be substantially incapable of managing his or her property or caring for himself or herself by reason of infirmities of aging, developmental disabilities, or other like incapacities." Wisconsin Stat. ch. 880 is itself clearly inapplicable here because there has been no indication that Kainz needs a general guardian, and as such, the question is whether the § 880.01(4) standard can nonetheless assist in the development of a standard for competency determinations in the context of Wis. Stat. § 807.10. We conclude that it cannot.

¶ 30. Wisconsin Stat. § 807.10, as noted, provides that a settlement of an action may be made by a "general guardian, if the guardian is represented by an attorney, *or* the guardian ad litem with the approval of the court" (emphasis added). Applying the Wis. Stat. § 880.01(4) standard in the context of § 807.10 leads to an unsound result. As the trial court recognized, if the statute was intended to allow for the settlement of disputes only for a person who has, or satisfies the requirements of needing, a general guardian, then the alternative language at issue here—"or the guardian ad litem with the approval of the court"—would be ren-

dered meaningless. Because statutes are to be interpreted in a manner that avoids rendering any of their parts meaningless surplusage, *see Mueller v. McMillian Warner Ins. Co.*, 2006 WI 54, ¶ 27, 290 Wis. 2d 571, 714 N.W.2d 183, we agree with the trial court's conclusion that the standard of § 807.10 is broader than under Wis. Stat. ch. 880. Thus, although we cannot disagree with Kainz that she may well fall outside of § 880.01(4)'s definition of incompetence, whether she does is irrelevant here, because the § 880.01(4) standard leads to surplusage and is inapplicable to § 807.10.

¶ 31. In addition to the above-mentioned reasons for why Wis. Stat. § 880.01(4) is an inappropriate competency standard for Wis. Stat. § 807.10, we note that it is important to distinguish between different shades of mental illnesses.

¶ 32. A guardianship addresses the long-term care of a mentally disabled person and contemplates removing a person's liberty to make decisions for an indeterminate amount of time. In Wisconsin, a " '[g]uardian' means one appointed by a court to have care, custody and control of the person of a minor or an incompetent . . . ." Wis. Stat. § 880.01(3).

¶ 33. A guardian *ad litem*, by contrast, is appointed in limited circumstances where the ward is unable, for purposes of a particular situation, to act in his or her own best interest, but this appointment does not imply a long-term, perpetual removal of the person's liberty to make decisions. The role of the guardian *ad litem* is not explicitly spelled out in the guardianship statutes, but in the chapter on actions affecting the family, it was defined as follows:

> The guardian ad litem shall be an advocate for the best interests of a minor child as to paternity, legal custody,

physical placement, and support. The guardian ad litem shall function independently . . . and shall consider, but shall not be bound by, the wishes of the minor child or the positions of others as to the best interests of the minor child.

Wis. Stat. § 767.045(4).[6] This distinction aptly highlights that the two types of guardians serve separate and distinct purposes and ought not to be confused. Indeed, our supreme court has explicitly stated that "[c]ompetency is a contextualized concept" and that "the meaning of competency in the context of legal proceedings changes according to the purpose for which the competency determination is made." *State v. Debra A.E.*, 188 Wis. 2d 111, 124–25, 523 N.W.2d 727 (1994). Thus, "[w]hether a person is competent depends on the mental capacity that the task at issue requires." *Id.* at 125.

¶ 34.  Moreover, our independent research into the legislative history of Wis. Stat. § 807.10 also supports the conclusion that Wis. Stat. § 880.01(4) is not an appropriate competency standard for § 807.10. Our research has revealed that in the 1943 version of the Wisconsin Statutes, Wis. Stat. § 260.24(2) (1943), the precursor to the current § 807.10, applied only to incompetent persons and, much like the current version, provided that either a guardian or guardian *ad litem* could enter into a compromise or settlement on behalf of the incompetent person.[7] In 1949, the statute was

---

[6] Wisconsin Stat. § 767.045 has been renumbered as Wis. Stat. § 767.407 and amended by 2005 Wis. Act 443, § 25, effective January 1, 2007. This change does not affect our analysis.

[7] Wisconsin Stat. § 260.24(2) (1943) read: "Compromise or Settlement.  A compromise or settlement of a pending action or

renumbered WIS. STAT. § 260.23(4) (1949). The 1949 version also reflects that the statute was amended to apply to not only incompetent persons, but also to minors, and the reference to a general guardian was also deleted, leaving only guardian *ad litem*, indicating that under the statute now only a guardian *ad litem*, and no longer a general guardian or guardian *ad litem*, could enter into a settlement or compromise on behalf of the ward.[8]

¶ 35. The statute remained unchanged in the 1955 version of the statutes, with the exception of being renumbered as WIS. STAT. § 269.80(1) (1955). In 1953, there was, however, discussion about amending the statute to again allow either a guardian *ad litem* or a general guardian to enter into settlements on behalf of the ward, but the proposed change did not take place and the language remained identical to that of the 1955 version until the 1969 version.[9]

¶ 36. Finally, in the 1971 version, the language was amended to again reflect that a settlement could be entered into by either a general guardian, if repre-

proceeding in which an incompetent person is a party may be made by the general guardian or by the guardian ad litem of the incompetent with the approval of the court in which such action or proceeding is pending."

[8] WISCONSIN STAT. § 260.23(4) (1949) read: "COMPROMISE OR SETTLEMENT. A compromise or settlement of an action or proceeding to which a minor or mentally incompetent person is a party may be made by his guardian ad litem with the approval of the court in which such action or proceeding is pending."

[9] WISCONSIN STAT. § 269.80(1) (1969) read: "COMPROMISE OR SETTLEMENT. A compromise or settlement of an action or proceeding to which a minor or mentally incompetent person is a party may be made by his guardian ad litem with the approval of the court in which such action or proceeding is pending."

sented by an attorney, or a guardian *ad litem* with the approval of the court.[10] The 1973 version remained unchanged. In 1974, the statute was renumbered WIS. STAT. § 807.10 (1975), and in the 1975 version of the statute, the language was also made gender-neutral; however, the substantive language remained unchanged.[11]

¶ 37. Although the legislative record is relatively sparse and clearly does not directly discuss the meaning of "incompetent," it does offer us some guidance about what competency standard not to use. As discussed above, originally the statute allowed either a guardian or guardian *ad litem* to enter into a settlement on behalf of his or her ward, but the language pertaining to a guardian was removed, leaving only guardian *ad litem*, and for over twenty years the statute provided that only a guardian *ad litem* could settle on behalf of a ward. Then, twenty years later, the statute was again amended to again allow both guardians and guardian *ad litem*s to enter into settlements. While it is unclear why the reference to a general guardian was originally removed, from this we are able to surmise that because for more than twenty years the statute made no men-

---

[10] WISCONSIN STAT. § 269.80(1) (1971) read: "COMPROMISE OR SETTLEMENT. A compromise or settlement of an action or proceeding to which a minor or mentally incompetent person is a party may be made by his general guardian, if he is represented by an attorney, or his guardian ad litem with the approval of the court in which such action or proceeding is pending."

[11] WISCONSIN STAT. § 807.10(1) (1975) read: "A compromise or settlement of an action or proceeding to which a minor or mentally incompetent person is a party may be made by the general guardian, if the guardian is represented by an attorney, or the guardian ad litem with the approval of the court in which such action or proceeding is pending."

tion of a general guardian, surely the legislature could not have intended the standard for competency under the statute to be the same standard that is required for a general guardian, expressed in WIS. STAT. § 880.01(4).

¶ 38. Second, Kainz contends that although WIS. STAT. § 971.13 is a criminal statute, it "provide[s] insight into what Wisconsin courts consider when dealing with the issue of incompetency." Section 971.13, as noted, sets forth the standard for a criminal defendant's competency to stand trial and reads: "No person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."

¶ 39. We agree that the statute provides valuable insight. Kainz, however, overlooks the fact that the trial court did address the applicability of WIS. STAT. § 971.13 to this case, even referring to it as "an arguably parallel criminal standard." Indeed, the trial court considered and incorporated both elements of § 971.13 into the second and third factors of the standard; the "ability to rationally evaluate litigation choices based upon [pertinent] information," and the "ability to rationally communicate with, assist and direct counsel," appear to closely resemble "substantial mental capacity to understand the proceedings or assist in his or her own defense," from § 971.13. Kainz does not discuss this similarity, but instead argues that she would not have been found incompetent under § 971.13. Because we conclude that § 971.13 is helpful and very similar to the standard on which the court ultimately settled, we will scrutinize Kainz's arguments more closely.

¶ 40. WISCONSIN STAT. § 971.13 is expressed as a disjunctive and provides that a person is incompetent if the person either "lacks substantial mental capacity to

understand the proceedings *or* assist in his or her own defense" (emphasis added). With respect to the first prong, Kainz claims that an individual may be considered incompetent if he or she "lack[s] the capacity to understand the proceedings against them." On this basis, Kainz argues that she would not have been found incompetent under this standard because although she concedes that she suffers from delusions, she asserts that "[t]here can be little doubt that she understood the proceedings of this litigation."[12] She also contends, citing *Garfoot*, that a defendant cannot stand trial under § 971.13 if that person would be required to stand trial "in absentia" and insists that she does not fall into this category because she is not "so unaware of what the proceedings are that [she is] virtually absent."

¶ 41. We disagree. First, she does not accurately describe the first prong of the statute when she states

---

[12] Kainz also insists that the trial court acknowledged that she understood the proceedings and apparently insinuates that it follows that she does not satisfy the first prong of Wis. Stat. § 971.13. It is true that, in concluding that Kainz satisfied the first prong of the three-factor test, the trial court did point out that she "does have the ability to understand pertinent information" and that "[s]he is not wholly delusional; she understands the role of the legal participants; she comprehends she has the option of proceeding to trial or accepting settlement; she is capable of understanding the basic provisions of the settlement proposal." Kainz, however, disregards the immediately following paragraph which provides:

> I am ... overwhelmingly convinced that due to her paranoid delusions, she is wholly incapable of rationally evaluating litigation choices based upon pertinent and reality-based information.

It is misleading for Kainz to claim that the trial court acknowledged that she "underst[ood] the proceedings" and that it follows that she would not satisfy the first prong of § 971.13 if this were a criminal case.

that a defendant must "lack the capacity to understand the proceedings." The statute reads "lacks substantial mental capacity to understand the proceedings." Omitting the words "substantial" and "mental" appears to lower the standard and is how Kainz is able to argue that she understood the proceedings. In addition, the reference to being tried "in absentia" is not a requirement for a criminal defendant to not be tried under WIS. STAT. § 971.13, but is merely one of several reasons that the *Garfoot* court set forth as one of the "theoretical reasons supporting the legal principle that an incompetent or unfit defendant may not be required to stand trial." *Id.*, 207 Wis. 2d at 221. However, even assuming that for a defendant to "lack the substantial mental capacity to understand the proceedings" they must be so mentally impaired that they are virtually absent, we cannot agree with Kainz that she necessarily fails to satisfy this standard because her reasons for refusing to settle were so consumed by delusions that it was, arguably, as though she was not even present.

¶ 42.   As to the second prong of § 971.13—"assist in his or her own defense"—Kainz claims the meaning of this language is that "[a] person can . . . be deemed incompetent to stand trial in a criminal case if he or she is unable to assist in his or her own defense." She then cites Justice Kennedy's concurrence in *Godinez v. Moran*, 509 U.S. 389, 403 04 (1993), which provides, with regard to a defendant's "ability to consult with [a] lawyer," that "the crucial component of the inquiry is the defendant's possession of a reasonable degree of rational understanding." On this basis she claims that her "misguided views and psychological problems cannot mean she is unable to assist in her own defense" and that she "just may have a distorted view of what amount of damage she will receive at trial." We disagree.

¶ 43. Kainz misreads the statute in claiming that the determining factor is whether the person is "unable to assist in his or her own defense." The statute reads: "No person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense." The words "assist in his or her own defense" would make little sense unless read together with "lacks substantial mental capacity to," so the correct reading of the second prong is "lacks substantial mental capacity to . . . assist in his or her own defense," *not* "is unable to assist in his or her own defense." Because Kainz misreads the statute, she then seeks to introduce a different standard from *Godinez* that describes a person's "ability to consult with a lawyer." As a result, Kainz's reference to Justice Kennedy's concurrence's use of the language "reasonable degree of rationale understanding" is of no relevance. Because the correct standard is whether the person "lacks substantial mental capacity to . . . assist in his or her own defense," her argument, based on *Godinez*, that "misguided views and psychological problems cannot mean she is unable to assist in her own defense," does not follow. In fact, her "misguided views and psychological problems" mean precisely that she is unable to assist in her defense because they show that she "lacks the substantial mental capacity" required. Therefore, we conclude that the trial court properly considered and incorporated the elements of Wis. Stat. § 971.13 into its standard, and that, contrary to what Kainz would have us believe, she would have been found incompetent under § 971.13.

¶ 44. Third, Kainz also argues that SCR 20:1.14 "seeks to protect clients and should not be a justification for taking away the autonomy of Ms. Kainz to make her own litigation decisions." Supreme Court Rule 20:1.14 provides:

(a) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

(b) A lawyer may seek the appointment of a guardian or take other protective action with respect to a client, only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest.

¶ 45. In its discussion about other existing competency standards, the court referenced SCR 20:1.14 when it stated "[t]he ethical rules governing our practice reference inability to make 'adequately considered decisions' or 'adequately act in the client's own interest.' SCR 20:1.14." In explaining the third factor, the "ability to rationally communicate with, assist and direct counsel," the court included a footnote referencing SCR 20:1.14, when it clarified that if this ability does not exist, the client is mentally incompetent, "even assuming the zealous assistance of counsel." This is presumably the reference Kainz meant by "justification for taking away [her] autonomy."

¶ 46. Unlike WIS. STAT. § 880.01(4) and WIS. STAT. § 971.13, SCR 20:1.14 is not a statutory standard for competency; rather, it is a guideline for lawyers about how to conduct themselves in situations where a client faces mental health problems. Significantly, the court clearly referenced SCR 20:1.14 in only this manner, merely noting that adhering to the relevant supreme court rules is part of what constitutes "zealous assistance." While we agree that because SCR 20:1.14 instructs attorneys on how to proceed when dealing with a client who has mental health problems it was appro-

priate to reference it in a discussion about how to determine competency under Wɪs. Sᴛᴀᴛ. § 807.10,[13] we disagree with Kainz that it was used as a "justification for taking away [her] autonomy" as it was only referenced in passing. Consequently, we conclude that because the rule is an ethical guideline for lawyers, it is of

[13] Although there has been no suggestion here that Kainz's lawyer acted inappropriately vis-à-vis his attorney-client relationship to Kainz, Kainz apparently insinuates just that. She first claims that "it was reasonably possible for [her] attorney to maintain a normal attorney-client relationship with her," but then adds that "[e]ven if her decision may not have been entirely rational, it does not necessarily follow that it was not reasonably possible for her attorney to maintain a normal relationship with her." Still, she insists that "as irrational as [her] decisions may seem," her attorney was still "obligated to follow [her] decisions." We are not convinced. The attorney-client relationship between Kainz and her attorney was not normal. In light of Dr. Feinsilver's report and Kainz's own testimony, it is apparent that Kainz's delusions affected deeply her understanding of the case and her beliefs about her lawyer's motives, which included a belief that her lawyer was part of a conspiracy and out to get her. Thus, to suggest that Kainz's "decision may not have been entirely rational" is an enormous understatement.

Inasmuch as part (b) instructs lawyers to seek the appointment of a guardian "only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest," Kainz claims that "lawyers and the Court should err on the side of a client's autonomy" which, according to her, based on the premise that it was possible for her attorney to maintain a normal attorney-client relationship, means that she should not have been declared incompetent. We are satisfied that there is no question that, due to her delusions, Kainz was unable to act in her own best interest in making litigation choices. Kainz's attorney acted properly in recognizing that a normal attorney-client relationship was not possible and in recommending the appointment of a guardian *ad litem*.

limited assistance in formulating a competency standard.

¶ 47. Finally, in a related argument, Kainz also contends, apparently in the alternative, that the second factor of the trial court's standard is "not properly supported by the law." She submits that declaring a person "who cannot *rationally* choose between available alternatives in the context of litigation" (emphasis added) incompetent should not be accepted as a standard for competency because it cannot be extracted from WIS. STAT. § 880.01(4), WIS. STAT. § 971.13, and SCR 20:1.14. She argues that the word "rationally" makes the standard broader than § 880.01(4), § 971.13, and SCR 20:1.14, and asserts that "someone could be considered irrational if he or she had poor or unsound judgment," and thus the use of the word "rationally" "may unduly trammel the right of future litigants." We again disagree.

¶ 48. First, it is curious that Kainz chooses to challenge only the second factor on grounds that the trial court used the word "rationally," even though the word "rationally" appears in the third factor in much the same way. Kainz does not explain her reasoning for objecting to the second but not the third factor. This discrepancy notwithstanding, we disagree with Kainz that the second factor was not "properly supported by the law."

¶ 49. In reaching the three-factor standard, the trial court discussed several different standards, including WIS. STAT. § 880.01(4), WIS. STAT. § 971.13, and SCR 20:1.14, as well as WIS. STAT. § 803.01(3)(a), the standard for the appointment of a guardian *ad litem*, and WIS. STAT. § 880.33(3), the standard for removing someone's right to vote. From these five standards, the

court derived the three factors it determined would appropriately measure competency in the context of WIS. STAT. § 807.10.

¶ 50. As to the court's decision to use the word "rationally," we cannot agree with Kainz that it broadens the standard such that the rights of future litigants may be at risk. Although the word "rationally" does not itself appear in any of the standards the trial court considered, we agree with Ingles that its use was logical, if not necessary, to appropriately qualify a litigant's choice between available alternatives in the litigation context. Given that WIS. STAT. § 807.10 addresses a guardian's or guardian *ad litem*'s authority to enter into a settlement agreement on behalf of his/her ward, it makes sense that if a person whose competency is in question is to be allowed to decide on their own whether to settle, that person must have demonstrated that he/she is capable of evaluating the proposal, comparing and contrasting its alternatives, and ultimately deciding what is in his or her best interest. If a person is capable of deciding whether to settle, but incapable of conducting the above-mentioned analysis, the person is not capable of *rationally* choosing between alternatives in litigation. Contrary to Kainz's concerns, this method merely assures that a person who cannot decide whether to go to trial by evaluating the available alternatives but decides based on, for instance, delusional beliefs, will not be allowed to make that decision. In other words, the fact that the choice must be a rational one does not threaten the rights of future litigants who might wish to go to trial instead of settling, because the analysis only applies when there is a reason to question the person's competency to begin with.

¶ 51. In summary, we have thus far concluded that: (1) the standard for incompetence under Wis. Stat. § 807.10 is broader than that under Wis. Stat. § 880.01(4) because a different interpretation renders the language regarding the guardian *ad litem* surplusage; (2) the trial court properly incorporated the elements of Wis. Stat. § 971.13 into the competency standard for § 807.10, and Kainz would have been found incompetent under § 971.13; (3) SCR 20:1.14 is of limited assistance because it addresses an attorney's ethical obligations when dealing with a client who is suffering from mental health problems, but was properly referenced by the trial court as a reminder to lawyers; and (4) the second factor of the trial court's standard was properly supported by law and the use of the word "rationally" does not violate the rights of future litigants.

¶ 52. Accordingly, we conclude that the standard used by the trial court was well-reasoned and appropriate. We therefore adopt the trial court's standard, and hold that the determination of whether an individual has satisfied the standard for mental incompetence under Wis. Stat. § 807.10 should be made by considering the following three factors: (1) the person's ability to reasonably understand pertinent information; (2) the person's ability to rationally evaluate litigation choices based upon that information; and (3) the person's ability to rationally communicate with, assist and direct counsel. If a client cannot reasonably understand the information; cannot rationally choose between available alternatives in the context of litigation; or cannot rationally communicate with, assist and direct counsel based upon pertinent information due to

705

mental illness, even assuming the zealous assistance of counsel, the client is mentally incompetent.

¶ 53. We also agree with the trial court's conclusion that while Kainz does have the ability to "understand pertinent information" and thus satisfied the first factor, she falls short of satisfying the other two. We agree with the trial court that many of Kainz's delusional beliefs, reported and testified to by Dr. Feinsilver and confirmed through Kainz's own testimony, connect the car accident to the insurance company and her lawyers in a way that fundamentally interferes with her ability to understand the settlement offer and makes her incapable of evaluating litigation choices in a rational, reasoned manner. The record also clearly shows that the various conspiracy theories that Kainz associates with the insurance company and her lawyer, including that hair salons dye her hair against her wishes, and global positioning and tracking devices have been inserted into her body, keep her from effectively assisting her lawyer. We agree with the trial court's characterization of the case:

> [T]hese are compelling circumstances. The litigation choices Ms. Kainz is making are pervasively dictated by her paranoid delusions. She is wholly incapable of reasonably and rationally evaluating the fairness of the proposed settlement; the risks and benefits of trial or settlement, the recommendations of counsel, the strengths and weaknesses of the respective parties' positions, and ultimately . . . she is incapable of "adequately considered decisions."

As a result, we are satisfied that the trial court did not commit clear error on declaring Kainz incompetent. *See Garfoot*, 207 Wis. 2d at 225.

706

¶ 54. We stress that these are exceptional circumstances in which an extraordinary methodology was appropriately utilized. Here, all parties agreed that Kainz's mental health had become a concern and brought the matter to the court's attention. First, the trial court ordered that the parties select a mutually agreed upon psychiatrist to conduct an evaluation, after which the parties agreed upon Dr. Feinsilver who evaluated Kainz. Based on Dr. Feinsilver's thirty-one page evaluation, in which he concluded that Kainz suffered from "severe psychiatric illness" and explicitly recommended the appointment of a guardian *ad litem*, the court concluded that there were sufficient indications that Kainz was unable to act in her own best interest and in need of a guardian *ad litem* to protect her interests. The court also ordered that the case be re-mediated. After the second mediation attempt failed, and in response to a motion to give the guardian *ad litem* the authority to settle under WIS. STAT. § 807.10, the court deferred ruling on the motion and ordered a competency hearing. At the adversarial hearing, Kainz was given the opportunity to address the court. Only thereafter did the court grant the guardian *ad litem* the authority to settle. After the competency hearing, a separate settlement hearing was held where the guardian *ad litem* explained to the court in great detail why he felt accepting the settlement was in Kainz's best interest and only then did the court approve the settlement. We commend the trial court for using great caution in handling this sensitive issue and going to great lengths to avoid jumping to conclusions. We advise future trial judges to use the same amount of caution and adhere to the same steps as the trial court did here.

## C. *Possibility that jury would award more than $125,000.*

■

¶ 55.   Finally, Kainz also contends, irrespective of the other arguments, that "her choice to not accept the settlement was not completely irrational" because a jury would not necessarily have awarded her less than $125,000 since there was evidence indicating that she should be entitled to more than $125,000. Kainz admits that she suffered from delusional disorder and pain before the accident, but claims that "that should not automatically mean the defendant will escape liability for Ms. Kainz's current levels of anxiety, pain and suffering." She contends that there was evidence connecting the accident to her more severe physical and emotional problems, and cites a statement by a Dr. Gorelick that was referenced in Dr. Feinsilver's report. Kainz also points to her own testimony which she calls "compelling testimony connecting her problems with the accident," and submits that a jury might have been more generous than the guardian *ad litem* anticipated and that it was error not to allow a jury to decide this case. We disagree.

¶ 56.   Kainz confuses what is at issue. The heart of her argument is that because it may have been possible for a jury to award her more than $125,000, her decision to reject the $125,000 settlement offer was "not competently irrational." In so arguing, she ignores her reasons for rejecting the offer and focuses solely on the amount that was offered and the fact that she rejected that offer. By this logic, any person who makes a decision that can be rationally justified, irrespective of what that person's actual reason was for making that

decision, should be an indication that the decision was "not completely irrational." This reasoning defies common sense.

¶ 57. Kainz's mental health is front and center in this case, and Dr. Feinsilver's report and testimony, as well as Kainz's own testimony, clearly established that Kainz's beliefs about the proceedings, the parties to the lawsuit and her own lawyer were tainted by her delusions. The mere fact that Kainz's rejection of the settlement offer can be rationalized due to the possibility that a jury might have awarded more than $125,000 does not decrease the effect of her delusions on her decision or make her decision any less irrational.

¶ 58. Moreover, at the settlement hearing, the guardian *ad litem* carefully laid out his reasoning for why he had come to the conclusion that it was in Kainz's best interest that he accept the settlement offer on her behalf. This explanation included his assessment that the likely verdict would be between $35,000 and $50,000, and for Kainz to net the $125,000 that was offered, she would have to "break the bank" and receive an award of $250,000. The guardian *ad litem* informed the court that he thought it was unlikely that this would occur. Kainz, however, did not merely dispute that her case was worth what the guardian *ad litem* had estimated, or that it was worth what Ingles had offered, which was more than double the guardian *ad litem*'s top estimate, but felt her case was worth between fifty and one hundred million dollars! This fact is a clear indication that even if there was a chance that the jury would have awarded more than the guardian *ad litem* estimated, and even if Kainz would have "broken the bank" and netted an amount equal to the settlement offer,

under no circumstance would her case have been worth what she expected to receive. For the reasons stated, we affirm.

By the Court.—Judgment and order affirmed.

¶ 59. FINE, J. (*concurring*). I join in the Majority opinion, subject to the following caveats.

¶ 60. First, insurance companies are not generally known for their disinterested largess. If, as the circuit court and the Majority assume, Jana Kainz's claim against the defendants was worth, as estimated by Kainz's guardian *ad litem*, between $35,000 and $50,000, why was General Casualty Company of Wisconsin willing, nay eager, to pay $125,000? This raises a red flag that is not satisfactorily answered by the Record.

¶ 61. Second, in my view, WIS. STAT. RULE 803.01(3) (2003–04) gives to the circuit court the ability to appoint a guardian *ad litem* for a party "the court has reason to believe . . . is mentally incompetent to have charge of the party's affairs." RULE 803.01(3)(a) (2003–04).[1] Certainly, as I read it, what the circuit court did here would be authorized under the amendment to RULE 803.01(3) (2005–06) ("if a party is . . . alleged to be incompetent"). I see no substantive difference between

---

[1] WISCONSIN STAT. RULE 803.01(3)(a) was amended effective December 1, 2006, to read, as material here:

> [I]f ~~the court has reason to believe that~~ a party is ~~mentally~~ adjudicated incompetent or alleged to be incompetent ~~to have charge of the party's affairs~~, the party shall appear by an attorney, by the ~~general~~ guardian of the ~~party's property~~ estate of the party who may appear by attorney, or by a guardian ad litem who may appear by an attorney.

2005 Wis. Act 387, § 224 (additions indicated by underlining; deletions indicated by strikeouts).

the old and the new language, and therefore agree that Wɪs. Sᴛᴀᴛ. Rᴜʟᴇ 807.10 (2003–04) permits what the circuit court did here. I express no opinion, however, because that issue is not before us, whether the amendment to Rᴜʟᴇ 807.10, also effective December 1, 2006, which changed the words "mentally incompetent" to "individual adjudicated incompetent," now requires a formal adjudication under Wɪs. Sᴛᴀᴛ. §§ 54.01(2)–54.50 (2005–06) before a circuit court may approve a settlement under the new Rᴜʟᴇ 807.10 (2005–06).

¶ 62. I agree that the criteria set out in the Majority opinion, adopting those used by the circuit court, are appropriate considerations when a circuit court believes it necessary to trump a party's desires in connection with the settlement of a civil lawsuit. Depending on the particular facts presented by future cases, the criteria may not be exhaustive, and should not be read as such.